IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

FILED E-FILED
Monday, 20 September 2004 02:12:13 PM
Clerk, U.S. District Court, ILCD

SEP 20 2004

JOHN M. WATERS, Clerk
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA, IL

Dr. Kenneth L. Wronke, )
)
       Plaintiff, )
)
vs. ) Cause No. 2001-2308
)
Champaign Cointy Sheriff's )
Department, and David Madigan, )
individually, and in his Official )
capacity as Sheriff of Champaign )
County, David Smalley, individually, )
and in his Official capacity as a )
Champaign County Sheriff's Deputy, )
and Lu Wilson, R.N., and dr. Maher K. )
ahmad, )
)
       Defendants, )
)

## MOTION TO STRIKE DEFENDANT WILSON'S MOTION FOR SUMMARY JUDGMENT

COMES NOW, the Plaintiff, Dr. Kenneth L. Wronke, appearing personally, with his Motion to Strike the Defendant Wilson's Motion for Summary Judgment and related documents and in support hereto states as follows:

1. That the Defendant's Motion seeks Summary Judgment on Count IV of the Plaintiff's Fourth Amended Complaint.

2. That the Defendant committed a fatal error in citing both the Wronke and the Wilson depositions when they have not been made part of the Court Record: "In order for a deposition to be used in support of a Motion for Summary Judgment, it must be formal and sufficient, i.e., it must either be signed by the Deponent or contain a waiver of the deponent's signature, and it must be certified, sealed, and filed with the Clerk of the Court." See <u>Bezin v. Ginsburg</u>, App. 1st. Dist.1978, 16 Ill Dec 595, 59 Ill App.3d 429, 375 NE 2d 468.

3. That Chapter allowing use of Deposition testimony in support of a Motion for Summary Judgment contemplates that depositions relied upon

is one which has properly been made a part of the Court Record. See previous ref. item 2.

4. The Wronke and Wilson depositions are not part of the Court Record when Defendant Wilson filed her Motion for Summary Judgment.

5. That because summary judgment is a drastic method of terminating litigation, Movant's entitlement must be free from dougt, and Court must construe evidence strictly against Movant and liberally in favor of non-moving party. See <u>Dash Messenger Service, Inc. v. Hartford Ins. Co. of Illinois</u>, App1 Dist 1991, 164 Ill Dec 313, 221 Ill App 3d 1007, 582 NE 2d, 1257.

6. That the Plaintiff alleges this Defendant carelessly and with negligence willfully failed and refused to report to the Satellite facility when she was in an "on-call" status if there was a need for medical intervention that was potentially life threatening. (SHOCK can be terminal)

7. That failure and refusal to immediately respond a medical emergency when it was Wilson's duty to report to the scene of the injury, is a manifestation of deliberate indifference, by a medical professional, as seen by any reasonable person.

8. That an unattended laceration of the forearm with a full rotator cuff tear and deformity of the shoulder with bleeding for over three hours that required 11 stitches to close constitutes a serious medical need.

9. That under Sect.6.6 of the Medical and Health Care Services published policy protocol (signed on to by Nurse Wilson) in the Absence of the Nurse or Doctor the staff at the Satellite facility was to within paragraph C-2 "stabilize and transport the individual to Carle or Covenant Hospital". see attachments from Sheriff's protocol.

10. That when the Plaintiff was unable to raise his right arm and there was an obvious limb/shoulder joint deformity(objective symptom) even the untrained person would conclude a serious injury is being manifested when the right shoulder could be compared to the uninjured left shoulder/limb joint.

11. That none of the Defendants,including Ahmad and Wilson , performed a "head to toe" patient assessment, took pulse,checked respirations, useda BP cuff and conducted the ABC's of emergency medicine..A for airway..B control bleeding..C check circulation at limbs. Ahmad and Wilson have emergency Medicine training and experience.

12. That when Wilson finally did confront the injured resident the next day, she did not ask to see the forearm nor the shoulder, the shoulder was deformed then and is still deformed this day; all she needed to do was look.

13. That it is interesting to note that Nurse Wilson did not know her job title as a contracted jail employee.i.e. she stated in her deposition her title was "Registered Nurse and Nurse Manager" while the Health Care Policies and Procedures protocol says she is the "Health Care Authority".

14. That there is no evidence of the necessary surgical equipment (sect. 7.6 list of medications and supplies) for any member of the staff medical or otherwise to use existing suture material,needle holder, etc. to perform surgery at the jail as ststed by Wilson on page 4 item 27 of her deposition. She cannot cite any such inventory of those items. That statement is not true.

15. Defendant Wilson does not offer any evidence that Medical Service Area(facility Aid Station) was accredited for surgical intervention of residents.

16. Defendant Wilson claimed in her sworn deposition that she saw the Plaintiff for " treatment " on 12 December 1999; there was no treatment of any kind by anyone after 11:00 A.M. on 12 December 1999.

17. That Wilson's "visit" to the Plaintiff (despite the fact that she was not required to) after the fact was her attempt to cozy-up to those who would critize her lack of professionalism for not responding immediately to the medical emergency at the jail.

18. That when there is a loss of blood for over 3 hours plus through a severe laceration of the forearm, a life-threatening condition is potentionally possible with the onset of Shock. No one, staff, nurse, nor physician inquired about how much blood was lost because of the injury; was there deliberate indifference, absolutely and a careless, negligent failure on the part of the Defendant and proximately causing permanent damage to the Plaintiff's shoulder.

WHEREFORE, the Plaintiff, Dr. Kenneth L. Wronke, respectfully seks a denial of and for the Court to Strike the Motion for Summary Judgment as the Defendant's explanation of the circumstances surrounding the injured Plaintiff are not free of doubt.

Respectfully submitted,

*Dr Kenneth L. Wronke*
Dr. Kenneth L. Wronke

CERTIFICATE OF SERVICE

I certify that a true and correct copy of the Motion to Strike with Affidavit was placed in the U. S. Mail at Danville, Illinois 61832 on the 17th day of September 2004 to the Clerk of the U.S. District Court, Room 218, 201 S. Vine st., Urbana, Illinois 61802, and to James j. Hagle, 129 W. Main st., Urbana, Illinois 61801, and to Kenneth D. Reifsteck, Box 560 at 30 E. Main st., Champaign, Illinois 61824-0560, and Richard P. Klaus, Suite 300, 102 East main st., Urbana, Illinois 61801.

*Dr Kenneth L. Wronke*
Dr. Kenneth L. Wronke

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

Dr. K. L. Wronke,            )
                             )
    Plaintiff,              )
                             )
vs.                          )   Cause No. 2001-2308
                             )
Champaign County Sheriff's   )
Department, and Daid Madigan,)
individually, and in his Official )
capacity as Sheriff of Champaign )
County, and David Smalley, individually, )
and in his Official capacity as a )
Champaign County Deputy Sheriff, and )
Lu Wilson, R.N., and Dr. Maher K. Ahmad, )
                             )
    Defendants,             )

## COUNTER-AFFIDAVIT, TO LUANN WILSON'S AFFIDAVIT, BY PLAINTIFF

I, Dr. Kenneth L. Wronke, being duly sworn under oath, do hereby swear to the truth of the following:

1. I have personal knowledge of all the facts set forth in this Couner-Affidavit.

2. That the Wilson Affidavit was part of the Reifsteck Motion for Summary Judgment.

3. I was incarcerated for indirect civil contempt at the Champaign County Correctional Center (Satellite) from 05 October 1995 through 20 March 2000 where some of that time LuAnn Wilson was a nurse.

4. Nurse Wilson, in her Affidavit, does not state the time of Day she received a page from CCCC on Sunday 12 December 1999.

5. According to the Wilson Affidavit, her instructions, after learning of the injured inmate(Plaintiff) were for Wronke to lay on his back and elevate his arm vertically to control the bleeding.

6. The Wilson Affidavit is silent regarding questions relative to the volume of blood loss from the injury; Ahmad failed to make that inquiry also.

7. I have read the National Academy Text for Emergency Medicine and that suggestion to control bleeding is not the protocol of choice.

8. I bled for over three hours before the contract physician(Ahmad) presented himself.(Master Control log at the Satellite would verify the actual time of his arrival.)

9. Neither Wilson nor Ahmad inquired about Shock. I became "Shocky" immediately after striking the counter and then falling 3 feet and hitting a garbage can edge on the way to the floor.

10. I am unable to locate in any provided jail protocols where inmates could be sutured, when necessary, at the jail site.

11. Wilson states she and Ahmad determined that Plaintiff Wronke's "minor" wound would require stiiches (it needed 11 to close the wound)and Ahmad agreed to do the surgery at the jail and not the Trauma Center.

12. I was present during the Accreditation of the Satellite facility and the Medical Department was not accredited to perform any surgical procedures on inmates.

13. In the Wilson Affidavit, she does not state(as the "On Call"Nurse) when or if she went to the Satellite jail on 12 December 1999.

14. I requested copies of the Master Control Logbook for the 11th, 12th, and 13th of December 1999 in my "Request for Documents"within R.26 which has not been complied with. That log is the only irrefutable for the time Ahmad arrived and Wilson arrived on those dates.

15. In the Wilson Affidavit she states she called the jail and advised "a Correctional Officer" that Ahmad would do the surgery on the Plaintiff Wronke at the jail.

16. Neither Sgt. Smalley nor his Superior on the 11 to 7 shift challenged the Wilson-Ahmad decision to perform surgery at the jail even though the Trauma Center was within walking distance.

17. I counted the sutures Ahmad placed in a so-called "minor" wound; they numbered 11 in the skin and an unknown number in the subcutaneous and muscular tissue.

18. Wilson states in her Affidavit that wounds can in closed with sutures up to six hours of opening. She neglects to mention that the statement is true only under the most favorable conditions in a surgical suite setting ...and not "meat-ball" surgery as one might see on M*A*S*H.

19. Ahmad put the Plaintiff Wronke at extreme risk of infection as he was contaminated even before he began unauthorized surgery; he couldn't wash his hands without touching the contaminated faucets at the sink--there is "no touch" plumbing at the jail medical department.

Further not sayeth the Affiant:

                                                                               Dr. K. L. Wronke

Subscribed and sworn to before
me on this 16th day of September 2004

OFFICIAL SEAL
IVAN T. SOLGARD
Notary Public, State of Illinois
My Commission Expires 6/28/08



# CHAMPAIGN COUNTY SHERIFF'S OFFICE

**DAVID J. MADIGAN**
Sheriff

204 E. Main Street
Urbana, Illinois 61801-2799
(217) 384-1204

## HEALTH CARE POLICIES AND PROCEDURES

Health Care Policies and Procedures shall be reviewed annually by the Sheriff of Champaign County, the Health Care Authority at the Champaign County Correctional Center, the Physician at the Champaign County Correctional Center and the Captain of Corrections of the Champaign County Correctional Center. All reviews and/or change orders of Health Care Policies and Procedure shall be signed and dated prior to implementation.

All General Orders and departmental procedures shall be reviewed on an annual basis. Any changes, additions or deletions shall be submitted to the Sheriff and the Health Care authority for approval.

2000 Review and Revision of Health Care Manual. Reviewed and approved by:

_____     1/10/01
Sheriff David J. Madigan             Date

_____     1/10/01
Dr. Maher Ahmad                      Date

_____     1/10/01
Lu Wilson, RN, Health Care Authority  Date

The Medical and Health Care Services Policy and Procedures Manual will be in use and effective as of 0800 hours on December 1, 2000.

        5. Begin First Aid and/or CPR. THE EMPLOYEE SHALL NOT ADMINISTER CPR UNLESS S/HE HAS A CURRENT CERTIFICATION.

B. The left side of the hallway is to be kept open for traffic.

C. The Supervisor, as Health Care Liaison, will coordinate the health care of the patient until the Nurse arrives on the scene. If the emergency occurs while the Nurse is in attendance at the Correctional Center, she will evaluate the situation and coordinate the care of the resident or staff member.

6.6 ABSENCE OF NURSE OR PHYSICIAN: IF THE EMERGENCY OCCURS WHEN THE NURSE IS NOT AT THE CORRECTIONAL CENTER, the Supervisor will be the Health Care liaison until the Nurse arrives.

   A. The Supervisor will evaluate and stabilize the employee/resident, using established treatment protocols.

   B. The Supervisor will notify the Nurse and describe the situation.

   C. The Nurse will contact the Physician, and treatment shall consist of:
      1. Telephone orders from the on-call Physician to treat and release the individual or,
      2. Stabilize and transport the individual to Carle or Covenant Hospital.

   D. If the Nurse directs the resident to be transported to the hospital, the supervisor will radio Master Control to notify the on-call ambulance (Arrow or Pro) or the Urbana Fires Rescue Squad to transport the patient.

   E. The Supervisor will provide a security detail to accompany the resident to the hospital.

   F. While awaiting the arrival of the Nurse, the ambulance or EMT personnel, the Correctional staff will begin CPR and basic First Aid until the arrival of trained medical personnel.

   G. If the medical emergency is extreme or the Physician and Nurse cannot be located by METCAD, the Supervisor is to see that First Aid procedures are started. An ambulance or the Urbana Fire Rescue Squad is to be notified to transport the resident to Carle or Covenant Hospital Emergency Rooms.

2:01-cv-02308-DGB    # 188    Page 11 of 15

MEDICAL AND HEALTH CARE SERVICES  3.

Chapter XIII    3
                Page of
Section 1       4

Subject: Health Care Authority                Date: June, 1987

| | |
|---|---|
| 1.3 NURSE: | The Champaign County Sheriff's Office will employ a licensed Registered Nurse who will be the designated Health Authority at the Center. The Nurse will be responsible for arranging all levels of health care and ensuring the quality and accessibility of all health services provided to residents. The Center's Nurse will be currently licensed with the State of Illinois and shall provide the employer with evidence of license. The Nurse will be responsible for the health care needs of all residents and arrangements for referral of residents to duly licensed health care service providers when the health care needs of the residents cannot be met by Correctional Center's Health Care staff. |



A. Health Care Authority: The Nurse shall direct and administer all levels of health care, assure quality of care and ensure resident access to all health services. The Health Care Authority, under the direction of the Physician, is responsible for the development and implementation of health care services which provide for the physical and mental well being for the residents. The scope of duties of the Nurse are detailed in a written job description which is reviewed annually and revised as necessary.

B. Chain of Command: The Correctional Center Nurse will work under the clinical supervision of the Physician and will report directly to the Captain of Corrections and Sheriff.

1.4 MEDICAL LIAISON: When the Physician or the Nurse is unavailable to respond to the health care or medical needs of the residents, the Shift Supervisor will be designated health care liaison and will coordinate health delivery services in the facility under the joint supervision of the responsible Health Care Authority and the Captain of Corrections or his designee.

A. Upon advice from the Physician or Nurse, health care services will be handled by the emergency rooms at Covenant Hospital and Physicians at Francis Nelson Health Center.

B. All medical orders will be signed by personnel authorized by law to give such orders. Treatment by health care personnel other than a Physician, Dentist, Physiologist, Optometrist, Podiatrist or other independent providers is performed pursuant to

| 2:01-cv-02308-DGB  # 188  Page 12 of 15 | Chapter XIII | 2 |
| MEDICAL AND HEALTH CARE SERVICES  4. | Section 1 | Page of 4 |

| Subject: Health Care Authority | Date: June, 1987 |

personnel will be verified by the Captain of Corrections and will be on file in the Nurse's Office.

1.2 PHYSICIAN: A Physician who is currently licensed to practice medicine in the State of Illinois will be retained for the health care of the residents at the Correctional Center by the Sheriff of Champaign County. The Physician shall provide proof of license to the Sheriff. <u>In addition to medical judgements and health care decisions,</u> the Physician will be responsible for carrying out the health care policies of the Correctional Center by initiating, reviewing and approving all health care policies and procedures. The Physician will sign-off on all approved health care policies, procedures and directives and will be the <u>final authority on all health care services provided to residents.</u>



A. Contract: There will be a written contract between the County of Champaign and the Physician which will govern the delivery of health care services to the residents at the Center. This contract will be signed by the Center's Physician, a duly authorized agent of the Champaign County Board of Supervisors and the Sheriff of Champaign County and will be kept on file with the Sheriff. This contract will comply with the laws of Illinois and the <u>Illinois Bureau of Detention Standards</u> and shall state, at a minimum, that the Correctional Center Physician will be responsible for clinical supervision of all allied health personnel within the facility and will have <u>sole responsibility for final medical judgements pertaining to patient care in the facility.</u>

B. The Correctional Center and Physician will arrange for health care services to be provided <u>prior to need</u>.

C. Medical staffing needs shall be reviewed annually by the Correctional Physician and the Captain of Corrections.

D. Recommendations concerning medical staffing needs shall be forwarded by the Captain of Corrections to the sheriff for referral to the County Board.

E. The Physician's contract will be reviewed annually.

F. The Center's <u>Physician shall report directly to the Captain of Corrections</u> and will be responsible for the clinical supervision of all health care personnel at the Correctional Center.

7.6 LIST OF MOST USED MEDICATIONS AND SUPPLIES:

DOCUSATE sodium tablets
CORICIDIN-D tablets
ACETAMINOPHEN tablets 325 mg
K-Y JELLY
TAGAMET 800 mg tablets
IPECAC syrup
CERUMINEX eardrops
HYDROGEN PEROXIDE
TINACTIN cream
Triple antibiotic creme
AROMATIC SPIRITS OF AMONIA inhalants
Examination gloves
2,3,4 inch ACE bandages
THERMA-COOL pacs
Tongue depressors
Adhesive tape
BETADINE solution
Cotton tipped applicators
Q-TIPS
Eye patch dressings
Cotton balls
BANDAIDS 1,2,3/4"

DIPHENHYDRAMINE 25 mg tablets
ASPIRIN 10 grains
TRIAMCINOLONE cream
EMETROL
RUFEN 600 mg tablets
CALAMINE LOTION
LINDANE lotion
Rubbing Alcohol 70%
STAY-FREE maxipads
TEMP-AWAY sheaths
Sterile and unsterile specimen containers
2x2 dressings
Plastic Disposal Medicine cups
Sterile and Nonsterile kling
Oral thermometers
RED CROSS toothache medicine
Denture containers
4x4 dressings
Disposal examination gowns
Paper tape

SYRINGES: 22G, 1",3" c.c., 25G,1",3 c.c. Insulin, TB, 10 c.c., 5 c.c.

NEEDLES: 20,22,25

*Where is the list of surgical supplies, drugs and equipment*

onset of coma or paralysis, injury with deformity or inability to move extremity or trunk.

6.3 **EMERGENCY MEDICAL COVERAGE:** The Champaign County Correctional Center Physician will provide 24-hour on-call response for emergency medical care for all residents and staff, whether the emergency be of an event which is a man-made or a natural disaster or the individual emergency medical needs of a single resident or staff member. On-site Physician coverage consists of eight hours per week.

    A. The Nurse will contact the Physician in an emergency health care situation. On-site nursing coverage consists of eight hours per day with 24-hour on-call response.

    B. The procedure for responding to medical emergencies shall be dated and signed by the Captain of Corrections and the Physician. The training plan addresses responses to single medical emergencies within four minutes and multi-medical emergencies within five minutes.

6.4 **EMERGENCY MEDICAL EQUIPMENT:**
    A. One wheelchair located in the Medical Services Area hallway.
    B. Ambu-bag located in Medical Services Area.
    C. Oxygen located in Booking at the downtown facility and in the Infirmary at the Satellite.

6.5 **INITIAL RESPONSE:** Correctional staff are to be aware that an emergency medical situation can occur at any time.

    A. When a staff person discovers a resident or a staff member in need of emergency medical attention, the following procedure will be implemented:
        1. Verbally calling to nearby employee for help
        2. Radio a CODE 3 and advise the Supervisor of the medical situation, the condition and location of the patient and the necessity of sending additional help.
        3. The Supervisor is to notify the Nurse.
        4. If necessary, the Correctional Officer should secure the area, restrict other residents from congregating in the emergency area and protect the area from contamination until relieved by the Supervisor.

| | CHAMPAIGN COUNTY SHERIFF'S OFFICE | Number Section 16 | Pages 1 of 6 |
|---|---|---|---|
| | DATE: June, 1987  7. | Standards: 3ALDF-1D-01,12,14,15, 3ALDF-4E-06, 17,24    NCCHC J19,20,21,22 | |
| Chapter: XIII MEDICAL AND HEALTH CARE SERVICES | | Subject: Health Care Training: Health Care Staff and Correctional Officers | |

HEALTH CARE TRAINING:  HEALTH CARE STAFF AND CORRECTIONAL OFFICERS

16.0 HEALTH CARE STAFF TRAINING:
There shall be a written training plan, approved by the Health Care Authority and the Captain of Corrections, which provides for all health services personnel to participate in orientation and training appropriate to health care delivery at the Champaign County Correctional Center. Training for health care personnel shall be carried out throughout the year, up to and inclusive of, forty hours of training. All training shall be documented.

16.2 ORIENTATION FOR HEALTH CARE STAFF:
All newly hired health care staff will be given an orientation to job requirements and expectations by his/her successor. An orientation to security will be given by the Captain of Corrections. Orientation will take place within the first four weeks of employment for all newly hired medical staff and other health care delivery staff (mental health, dentist, etc.).
A. Orientation will include, but is not limited to:
1. Tour of the Correctional Center
2. Review of health care and relevant policies and procedures for signature
3. Introduction to personnel and chain of command
4. Operational procedures (purchasing, insurance, parking, etc.)
5. Instructions on health care procedures and practices which are pertinent to the employee's discipline
6. Record keeping
7. Emergency medical, evacuation and disaster plans
8. Security requirements and procedures
B. Training programs which assist the medical staff to function effectively in a correctional setting will be incorporated into the development of training plans. Training will be of sufficient detail to enable medical staff to be thoroughly familiar with the rules of resident conduct, rules rationale and security requirements. Training opportunities will