

**E-FILED**
Friday, 01 October, 2004  02:31:41 PM
Clerk, U.S. District Court, ILCD

November 14, 2003


Ken Wronke
c/o Mr. Ken Wronke
Ken Wronke
Route 49, South Box 75
Homer  IL  61849


Re:  <u>**Wronke v. Champaign County Sheriff's Office, et al.**</u>


The deposition you gave November 7, 2003, in the above-referenced matter has now been transcribed.

Since you did not waive signature, you need to telephone my office (217-356-5119) to request that your deposition be printed; so that you may read your testimony, make whatever corrections based on errors in reporting or transcription you feel are necessary, and sign the signature page.

In accordance with Federal Rules, you need to read and sign within 30 days.



Sincerely yours,

Ann Parkinson


Enclosures
cc: Mr. James J. Hagle
    Mr. Kenneth D. Reifsteck
    Mr. Richard P. Klaus

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
STATE OF ILLINOIS

KEN WRONKE,

     Plaintiff,

   -vs-                               No. 01-2308

CHAMPAIGN COUNTY SHERIFF'S
OFFICE, AND DAVID MADIGAN,
individually AND IN HIS
OFFICIAL CAPACITY AS SHERIFF
OF CHAMPAIGN COUNTY, and
DAVID SMALLEY, INDIVIDUALLY and
IN HIS OFFICIAL CAPACITY AS A
CHAMPAIGN COUNTY SHERIFF'S DEPUTY
and LU WILSON, and DR. MAHER K.
AHMAD,
     Defendants.

CONTINUED DEPOSITION


    The Deposition of KENNETH WRONKE, a

citizen of the State of Illinois, a witness of

lawful age; produced, sworn, and examined upon his

corporeal oath, at the Law Offices at 102 East

Main, Urbana, Illinois on November 7th, 2003,

before Deann K. Parkinson, CSR, Notary Public in

and for the County of Champaign and State of

Illinois, as a witness in a certain suit and

matter now pending and undetermined in the United

States District Court for the Central District of

Illinois.

COPY

Page 96

1       CSR License No. 84-002089

Page 98

1        KENNETH WRONKE,

2 the deponent herein, called as a witness, after

3 having been first duly sworn, was examined and

4 testified as follows:

5      THE WITNESS: Hold on.  We got a couple

6 things I got to correct on this last deposition,

7 if you don't mind.  There is some errors that need

8 to be looked at.

9      MR. HAGLE: You can't really change it.

10      THE WITNESS: I don't sign off on it, if

11 I have to sign off on it at the end of the

12 deposition.

13      MR. HAGLE: The rules don't allow you to

14 make substantive changes.  If you are saying there

15 is some typographical errors, you will be provided

16 with a copy of it.  And you certainly can make

17 those typographical errors and correct them.

18      MR. KLAUS: My suggestion is this.  This

19 was a suspended deposition, meaning it's not

20 completed.  When we complete it at the end of

21 this, you will have the right to indicate on the

22 record whether you wish to reserve signature and

23 review it, and then whatever, you can make any

24 changes, is something we can all discuss later.

Page 97

1

Appearances:

2

MR. KENNETH REIFSTECK
3    Thomas, Mamer & Haughey
    30 E. Main Street
4    PO Box 560
    Champaign, IL  61824-0560
5    Appearing for Champaign County

6    MR. JAMES HAGLE
    Frederick & Hagle
7    129 West Main
    Urbana, IL  61801
8    Appearing for Dr. Ahmad

9    MR. RICHARD KLAUS
    Heyl, Royster, Voelker & Allen
10   102 East Main Street
    Urbana, IL  61801
11   Appearing for Lu Wilson

12   MR. KEN WRONKE
    Route 49 South
13   PO Box 75
    Homer, IL  61849
14   Phone:  896-2322

15 Also present:  Dr. Ahmad

16

17

18

19

20

21

22

23

24

Page 99

1 But you have the right at the end of the

2 deposition, once the final transcript is created,

3 she will send it to you with an errata sheet and a

4 signature sheet and you can go through and attempt

5 to make or not make any changes you think are

6 necessary.  So now is not the time for that,

7 respectfully I would suggest to you that you do

8 that at the end, once the deposition, the last

9 transcript is created.  I'm sorry, Jim.

10     MR. HAGLE: All right.  So, we're going

11 to continue with your deposition.

12     THE WITNESS: Okay.

13     MR. HAGLE: You understand that?

14     THE WITNESS: Yes.

15     EXAMINATION BY

16     MR. HAGLE:

17    Q.  I wanted to ask you a few questions

18 again about the incident that occurred on December

19 12, 1999.  We had asked you some questions earlier

20 in this deposition about how you fell, and I'd

21 like you, if you could, with a little more detail,

22 describe again when you were falling, the position

23 of your right arm.  You said you, what caused you

24 to begin to lose your balance, first of all, just

Page 96 - Page 99

Page 100

1 by way of foundation?

2    A. The barrels separated from the casters,

3 the barrel I was riding in.

4    Q. You were what?

5    A. The barrel separated from the casters

6 that the barrel was riding on.

7    Q. What did that do to you? I mean, if the

8 barrel came off a caster?

9    A. It startled me so I jumped backward to

10 get out of the way.

11    Q. How far back did you jump?

12    A. I don't know, a few feet, three or four

13 feet. It's kind of a narrow place right there in

14 the booking area.

15    Q. So you stepped back or jump back?

16    A. I jumped back and stumbled back. I lost

17 my balance going backwards.

18    Q. And when you lost your balance, at what

19 point where were your arms, or were they at your

20 side?

21    A. My arm was out in back of me because I

22 knew the counter was right behind me, I was afraid

23 it would catch my small of the back on my counter,

24 so I put my hand behind me.

Page 101

1    Q. Can you show me what position your arm

2 would have been at when you put it behind you?

3 You are indicating your hand would have been still

4 below your waist?

5    A. Well, as far as I can recall my hand was

6 at about a 45 degree angle. My arm was about a 45

7 degree angle with my body.

8    Q. Was your hand at a position about at or

9 below your waist?

10    A. I don't remember. I think it was below

11 my waist.

12    Q. And your arm was at about a 45 degree

13 angle? Was it on your side or was it directly

14 behind you?

15    A. It was right behind me because I was

16 trying to catch myself from hitting the counter.

17    Q. Okay. And did you ever raise your arm

18 from that position, or was it always down as you

19 were going down?

20    A. I don't remember. Those are details that

21 are flighty.

22    Q. Your arm was never above your shoulder,

23 correct? I mean, you didn't lift your hand above

24 your shoulder, did you?

Page 102

1    A. No, not during that incident, no.

2    Q. And you didn't push your -- you didn't

3 extend your arm directly backwards, correct? It

4 was at this angle?

5    A. It was back at about I'd say 45 degrees,

6 but it was straight behind me.

7    Q. Okay. And then you hit the counter

8 first with your arm?

9    A. My hand hit the counter.

10    Q. Your hand, which portion? Your palm

11 or --

12    A. Just my palm and then my forearm hit the

13 counter.

14    Q. Okay. And did you suffer the laceration

15 from striking your forearm?

16    A. No.

17    Q. On the counter?

18    A. No.

19    Q. Okay. Which portion of your forearm hit

20 the counter?

21    A. The portion between my wrist and my

22 elbow.

23    Q. Well, I mean was it on the outer aspect?

24    A. Underside.

Page 103

1    Q. Is that where you got the cut?

2    A. The underside is where I got the cut.

3    Q. That is the portion that hit the

4 counter, is that correct?

5    A. Yes.

6    Q. And then you continued down from there?

7    A. I continued falling.

8    Q. Then what did your arm --

9    A. My forearm hit the garbage can lip.

10    Q. And that's what cut you?

11    A. Well, there was, the garbage can had a

12 lot of sharp edges on it and that's -- one of

13 those sharp edges I assume cut my forearm, yes.

14    Q. Where were the sharp edges on the

15 garbage can?

16    A. Right on the outside edge of the top

17 ring of the can.

18    Q. So, you went from a position of about

19 three to four feet until your forearm came into

20 contact with the sharp edge, correct?

21    A. My hand came in contact with it first,

22 then my forearm. Then I fell to the floor.

23    Q. So, you went from a height of about you

24 told us before I think the counter was about three

Page 100 - Page 103

Page 104

1 or four feet?
2    A.  I think it's around 36 inches, but I'm
3 not sure.
4    Q.  So you went from about 36 inches to the
5 top of the can and then to the ground?
6    A.  No, it's not 36 inches to the top of the
7 can.
8    Q.  No, you went from 36 inches to the top
9 of the can?
10   A.  Right.
11   Q.  How high up is the can off the ground
12 then?
13   A.  I don't know.  The can may be, it looked
14 like a five gallon can, so it may be what, 18
15 inches, 12 inches.
16   Q.  So, the can actually broke your fall to
17 the ground, correct?
18   A.  Well, as I recall, I hit the counter,
19 hit the can, hit the floor.
20   Q.  What part of your body hit the floor?
21   A.  Pardon?
22   Q.  What part of your body hit the floor?
23   A.  My rear end.
24   Q.  That's what I'm saying; you didn't land

Page 105

1 or brace yourself with your hand on the floor or
2 your arm on the floor, correct?
3    A.  No, I couldn't.  I hit the can first.
4    Q.  Well, I am correct then, you did not
5 brace yourself or stop your fall with your hands?
6    A.  Right.
7    Q.  Or your arm, correct?
8    A.  Right.
9    Q.  You just went directly on your butt on
10 the ground?
11   A.  I hit the counter and went right down
12 the face of the counter to the floor, on the way
13 of going down my arm cut the edge of the garbage
14 can.
15   Q.  Then your butt hit the ground?
16   A.  Then my butt hit the ground.
17   Q.  Now, when you were incarcerated from
18 December 12, 1999 until your release March 20,
19 2000?
20   A.  I was incarcerated from October 5, 1995.
21   Q.  No, I meant from the time of this
22 incident?
23   A.  Oh.
24   Q.  From the time of this incident, December

Page 106

1 12, 1999 until your release on March 20, 2000,
2 which individuals did you come into contact with
3 on a daily basis or regular basis at the
4 correctional facility other than other inmates?
5 Can you give me the names?
6    A.  The officers all had rotating shifts, so
7 sometimes I came in contact with them and
8 sometimes I didn't.
9    Q.  Which ones do you have a recollection of
10 having the most contact with during this time
11 period?
12   A.  Gary Day was one I frequently had
13 conversations with.  And the rest of the officers
14 from time to time.  But--
15   Q.  I want to know which ones stick out in
16 your memory that you would have had the most
17 contact with?
18   A.  Officer Myers.
19   Q.  Do you know his first name?
20   A.  No, I don't.
21   Q.  Who else?
22   A.  I can't remember some of the names of
23 the officers because it's been such a long time.
24 Todd, I can't think of his last name.  Big guy up

Page 107

1 from around Flatville, but I can't think of his
2 last name.
3    Q.  Did you also have contact with an LPN
4 Joyce?
5    A.  Yes.
6    Q.  Joyce Ahrens?
7    A.  Ahrens.
8    Q.  Ahrens?  Did you ever make any
9 complaints of shoulder pain to Joyce Ahrens?
10   A.  Yes.
11   Q.  Was that in her official capacity as a
12 medical person at the jail, or just incidental
13 contact?
14   A.  Incidental contact.
15   Q.  I take it from your last deposition you
16 never sought formal, medical treatment or
17 attention through the Champaign County
18 correctional facility from December 12, 1999,
19 through March 20, 2000, other than the initial
20 visit with Dr. Ahmad and when the stitches were
21 taken out?
22   A.  I would have to look at the medical
23 record.  You have to submit a medical request to
24 see the doctor at the facility, and I'm not sure

Page 108

1 if during that period of time I ever did. I don't
2 think I did. But I may have.
3    Q. Okay. You don't have any recollection
4 of ever submitting a request for medical attention
5 for your right shoulder after you had the stitches
6 taken out of your arm, do you?
7    A. I don't recall.
8    Q. Well, your best recollection is you did
9 not?
10    A. I don't think I ever submitted a formal
11 request, which is to go through the system with a
12 yellow sheet. It's a yellow request for medical
13 treatment or medical examination or whatever.
14    Q. And you certainly knew the procedure
15 that you had to follow to do so if you wanted to
16 get medical attention, correct?
17    A. That's true.
18    Q. Okay. And in terms of individuals that
19 you did speak with, even though a formal request
20 hadn't been made you would have talked to Joyce,
21 is that correct?
22    A. Yes.
23    Q. About your right shoulder?
24    A. Yes.

Page 109

1    Q. You talked to Gary Day about your right
2 shoulder?
3    A. Yes.
4    Q. And did you also talk to Lu Wilson again
5 about your right shoulder?
6    A. No.
7    Q. Anybody else in an official capacity
8 that you remember talking about your right
9 shoulder other than Joyce Ahrens, A-H-R-E-N-S and
10 Gary Day?
11    A. No, I don't remember the names. I'm
12 sure I talked to several of the officers, I just
13 don't remember who they are.
14    Q. When you were in the jail from December
15 12, 1999 through March 20, 2000, I take it you
16 were in pain every day, correct? On your right
17 shoulder?
18    A. I was uncomfortable.
19    Q. Okay. You were uncomfortable every day?
20    A. Yes.
21    Q. And you used your arm differently during
22 that time period? In other words, how you carried
23 yourself, how you held your arm, how you carried
24 things, how you did your job duties, is that

Page 110

1 correct?
2    A. That's not correct.
3    Q. I thought you did?
4    A. I carried my arm at my side like I
5 always did when I wasn't doing anything. But when
6 I used my right arm to brush my teeth I did so by
7 having my elbow close to my body and using my arm
8 from my elbow to my hand.
9    Q. So, you did that differently?
10    A. Well, differently from what I normally
11 do, yeah.
12    Q. Right. During this time period of
13 December 12, 1999, through March 20, 2000, did you
14 also use your right arm differently for other
15 functions other than brushing your teeth?
16    A. I suppose I did. Any function of
17 washing my face, shaving, combing my hair, those
18 were all functions that had to be modified.
19    Q. How did you modify your use of the--
20    A. By keeping my elbow close to my side.
21    Q. And when you did your job in the laundry
22 room did you use your right arm differently?
23    A. I didn't use it as much. Most of the
24 work load was assumed by my left hand since it was

Page 111

1 a matter of putting things in the washer or taking
2 things out of the dryer.
3    Q. When you experienced discomfort, did you
4 ever, in your mind, physically show pain, like by
5 your face, like grimacing during this period of
6 time between 12-12-99 through March 20, 2000? Do
7 you believe you ever physically showed signs of
8 pain in your facial area?
9    A. When I went to get over-the-counter
10 medications from Joyce Ahrens, I'm sure she could
11 see in my expression that I was uncomfortable.
12    Q. And when did you go get over-the-counter
13 medications from Joyce Ahrens?
14    A. Every few days.
15    Q. What did you get?
16    A. Usually aspirin or Ibuprofen or Tylenol.
17 They have no pain medicines in the jail as pain
18 medicines like prescription pain medicine. It's
19 all over-the-counter stuff.
20    Q. And would she keep a record of the
21 dispensation of that medication to you?
22    A. I don't know if she did or not.
23    Q. Okay. But you actually made formal
24 requests of her as a medical person?

Page 112

1　A. A verbal request that my shoulder was
2 bothering me, do you have something that I could
3 take for my shoulder.
4　Q. After your release on March 20, 2000,
5 until you first saw Dr. Marsh, I think Dr. Marsh
6 was the first doctor you officially saw for your
7 right shoulder after your release, correct?
8　A. Of course I talked to Dr. Camerich's
9 (phonetic) wife, and I think that I talked to L.
10 Scott Cook of Carle, but I'm not sure whether it
11 was before I saw Dr. Marsh or after. I think it
12 might have been before. He rendered an opinion in
13 writing, and I'm not sure what the date is of that
14 opinion.
15　Q. You never went in and saw him?
16　A. Not in a formal office setting, no.
17　Q. Is he a friend of yours?
18　A. Sort of.
19　Q. What does that mean, sort of? We are
20 talking about Dr. Scott Cook from Carle?
21　A. Right.
22　Q. He's a cardiologist, correct?
23　A. He's an upper torso specialist.
24　Q. I thought he was a cardiologist, heart

Page 113

1 doctor?
2　A. That may be his specialty, I think it's
3 chest and that kind of thing.
4　Q. And you said he's sort of a friend; what
5 does that mean?
6　A. Well, we don't play golf together or
7 anything. It's just that we have something in
8 common, we are both in medicine, they have
9 animals, I take care of animals, so from time to
10 time I converse with his wife and on occasion with
11 him. But usually he's too busy for any kind of
12 budding relationship.
13　Q. You never --
14　A. Or golf or fishing.
15　Q. You never saw him as a patient? Am I
16 correct you never saw Dr. Cook as a patient?
17　A. I sought his opinion as a physician,
18 yes.
19　Q. Well, you never saw him where he
20 examined you as a patient, correct?
21　A. In a clinical setting, right.
22　Q. But you are saying you gave him a
23 history, and he gave you some opinion?
24　A. Right.

Page 114

1　Q. Do you know what that opinion was?
2　A. That the patient would have been better
3 served in an emergency room setting basically is
4 what it boils down to.
5　Q. And then the first doctor you saw where
6 you actually were examined for your right shoulder
7 after release was Dr. Marsh, correct? That was in
8 January of 2000?
9　A. That's right. I'm not sure, I don't
10 recall the examination, but yeah, I saw her in her
11 office, as soon as I told her that I had a
12 shoulder injury, she said that she was a general
13 practioner and that she would refer me to somebody
14 else. So it was of short duration.
15　Q. Do you remember when you talked with Dr.
16 Cook?
17　A. I'd have to look at the letter he gave
18 me and the letter is in the file, but I don't
19 think Robert Auler put it in the system. I think
20 he kept it off to the side.
21　Q. I have seen the letter, I can't remember
22 the exact date, but it would be around the time of
23 the--
24　A. It came, him and I, our conversation

Page 115

1 occurred prior to that letter.
2　Q. Right. Within probably a few days?
3　A. I suppose a few days, yeah.
4　Q. Okay. You never saw Dr. Marsh other
5 than one time for your right shoulder, correct?
6　A. No, I saw Dr. Marsh twice.
7　　MR. KLAUS: He just faxed it to us. It's
8 just one day.
9　Q. I just wanted to tell you, I have got
10 her records that were sent to me and she only has
11 one visit.
12　A. There was two. The second visit she
13 referred me to Dr. Plattner. The first visit she
14 referred me to Dr. Dethmer.
15　Q. Maybe she didn't examine you the second
16 time, do you know if she did?
17　A. No, she didn't. I just went in the
18 outer office, I think they set the second visit up
19 right at the desk, so--
20　Q. That apparently was February 28th is
21 when they scheduled your appointment with Dr.
22 Plattner, so that would be your second visit with
23 her when they set up the visit with Plattner,
24 correct?

## Page 116

1   A. I'm not sure.
2   Q. Okay. It said here that in January
3 17th, 2001, that at that time you could not pick
4 up a cup of coffee with your right arm, correct?
5   A. I think it was a pot of coffee.
6   Q. Well, he tells me that he can not pick
7 up a cup of coffee?
8   A. Well, she is mistaken. It was a pot of
9 coffee because I made the same statement during
10 our first deposition, I think.
11   Q. And that would be true throughout the
12 time you were in the jail?
13   A. A pot of coffee, right. The weight of a
14 pot of coffee I could not lift.
15   Q. How much do you estimate that as?
16   A. What, weight?
17   Q. Yeah.
18   A. Whatever a pot of coffee weighs, I
19 suppose.
20   Q. What were you thinking when you said you
21 couldn't lift up a pot of coffee?
22   A. I wasn't thinking in terms of weight. I
23 was thinking in terms of --
24   Q. A pot of coffee like this one here that

## Page 117

1 I just picked up?
2   A. I think they are like the ten cup pots.
3   Q. Okay. Did you ever remember an instance
4 where you tried to pick up a ten cup pot of coffee
5 and you couldn't do it?
6   A. Well, it was with a great deal of
7 discomfort.
8   Q. Where did you do that at?
9   A. At the Casey's.
10   Q. That was after you were released?
11   A. Right.
12   Q. Obviously? Have you had any further
13 conversations with Dr. Marsh about your right
14 shoulder injury other than what's reflected in her
15 records?
16   A. No.
17   Q. And then we already went through why you
18 didn't see Dethmers, and apparently the next
19 doctor you saw was Dr. Plattner, correct?
20   A. Right.
21   Q. And the date of his visit appears to be
22 on March 9th, 2001, does that sound right?
23   A. I'm not sure. I don't have my records
24 with me, so I can't tell you whether it was right

## Page 118

1 or wrong.
2   Q. And according to what you told Dr.
3 Plattner, you complained bitterly of pain at the
4 time you injured your arm, is that correct?
5   A. I suppose that's true, yes.
6   Q. And then after your release in March of
7 2000, you had difficulty sleeping for eight
8 months, correct?
9   A. Difficulty sleeping, right, I had to
10 sleep on my left arm.
11   Q. Okay. So, you told Dr. Plattner in
12 March of 2001 that after your release of March of
13 2000 you had difficulty sleeping for eight months
14 because of pain, is that correct?
15   A. Correct.
16   Q. And that would have included pain, I
17 take it you had difficulty sleeping even while you
18 were in the jail after?
19   A. After the injury, yeah, right.
20   Q. By the time you saw Dr. Plattner on
21 March 9, 2001, you indicated to him that the pain
22 had lessened somewhat, correct?
23   A. True.
24   Q. When did it start to lessen?

## Page 119

1   A. I don't recall.
2   Q. Your chief complaint when you saw Dr.
3 Plattner was a weakness? Not pain?
4   A. Was loss of range of motion, loss of
5 strength and pain. Not necessarily in that order.
6   Q. Okay. Loss of range of motion?
7   A. Loss of range of motion, loss of
8 strength, and pain, not necessarily in that order.
9   Q. So, you wouldn't agree that your chief
10 complaint as of March 9th, 2001, was weakness?
11   A. Weakness and range of motion were
12 probably the chief complaints. The pain was
13 tolerable by that time.
14   Q. In terms of your chief complaints just
15 being weakness, you wouldn't agree with that as of
16 March 9, 2001?
17   A. Well, let's see. When the injury
18 occurred it would have been pain first, loss of
19 range of motion second, and strength third. And
20 then it would be, then later on it would be loss
21 of range of motion, strength, and pain last, so
22 that's about the way it would have appeared at
23 that time.
24   Q. So I just asked you, as of March 9,

Page 120

1 2001, you wouldn't agree that your chief complaint
2 was weakness?
3    A. It could be either weakness or loss of
4 range of motion.
5    Q. Okay. Then Dr. Plattner ordered an MRI,
6 correct?
7    A. That's correct.
8    Q. And then you went and saw him one time
9 after that?
10    A. Once or twice, I'm not sure how many,
11 but it was I know once for sure, but it may have
12 been twice.
13    Q. And Dr. Plattner said either you could
14 live with it, do nothing, take
15 anti-inflammatories, have therapy injections or
16 maybe even surgery, correct?
17    A. He wasn't very optimistic, but I think
18 that's probably the range of his explanation, yes.
19    Q. And did you ever return to see Dr.
20 Plattner?
21    A. No, I've called the office before, and I
22 also had been there once.
23    Q. Okay. So then you haven't been back
24 since, according to the records since March?

Page 121

1    A. Yeah, but I haven't talked to him.
2    Q. The records indicate the last time you
3 were there was March 23, 2001, you haven't been
4 back since, correct?
5    A. Not for a formal examination, no.
6    Q. You have been back to see him for any
7 reason?
8    A. I was back in October of this year
9 because there was a new procedure, new surgical
10 procedure on Web MD on the Internet that I wanted
11 to know if he knew anything about it, or whether
12 or not it was just urban myth.
13    Q. Did you talk to him about it?
14    A. No, I talked to the girl at the desk and
15 they were going to call me and they never called
16 me back.
17    Q. What is this new procedure you saw on
18 the Web?
19    A. I don't know.
20    Q. That was October of 2003?
21    A. Yep.
22    Q. Okay. So, according to the records the
23 last visit with Dr. Plattner was March 23, 2001;
24 as far as you can testify you've never returned to

Page 122

1 see him formally as a patient, correct? Where
2 you've been examined and seen by the doctor,
3 correct?
4    A. I have not been back to see him for
5 anything relative to the shoulders, right.
6    Q. Okay. But, you did go back to Carle in
7 February of 2002 for her hernia?
8    A. Correct. I went to the surgery center.
9 There's two surgery centers in Danville. Carle
10 runs one and I think the physician runs the other
11 one separately. I think it's a private thing with
12 the physicians.
13    Q. So you did go to the surgery center in
14 February?
15    A. Went there.
16    Q. For a hernia?
17    A. Right.
18    Q. And had some treatment for that,
19 correct?
20    A. Yep.
21    Q. And that was the last time you saw a
22 doctor for any reason was for a hernia in March of
23 2002, is that correct?
24    A. I think that year, 2002, I would have to

Page 123

1 look at my medical license, my medical
2 certificate, but I think that was the year I also
3 had a flight physical in October.
4    Q. And who did that?
5    A. I don't know what his name is. A flight
6 surgeon in Indiana.
7    Q. Then that would have been the last time
8 you were seen by a doctor for any reason?
9    A. Well, that would have been the last time
10 I saw a doctor. Well, that's not the last time.
11 I saw Dr. Erhardt, it was last year.
12    Q. Okay. Were you examined by Dr. Erhardt?
13    A. At his home, yes.
14    Q. At his home?
15    A. Uh-huh.
16    Q. When was that?
17    A. I don't recall the date.
18    Q. Okay. Was it in the year 2003?
19    A. I think it was last year. Late last
20 year.
21    Q. Why did you go see Dr. Erhardt in his
22 home?
23    A. Robert Auler told me he wanted me to see
24 him.