Page 124

1  Q. So your attorney at the time sent you
2  there?
3  A. Uh-huh.
4  Q. Is that yes?
5  A. Yes.
6  Q. Did you know Dr. Erhardt before Mr.
7  Auler sent you there?
8  A. Not, I don't recall ever meeting him. I
9  think we passed at one time or another, but--
10 Q. Okay. What did he do for you, Dr.
11 Erhardt?
12 A. He examined my back and my shoulder,
13 collar bone, shoulder joint.
14 Q. You did this in his house?
15 A. Yes.
16 Q. Did you find that a little unusual you
17 were going to see somebody and get examined at
18 their house?
19 A. No, not really.
20 Q. What did he say to you, Dr. Erhardt?
21 A. He made some notations and hemmed and
22 hawed and sighed and messed around with the back
23 of my shoulder and on my back. And put his finger
24 on a couple of of different spots and made some

Page 125

1  notes. That was all he said.
2  Q. Did he give you a diagnosis?
3  A. Well, he assumed I already knew the
4  diagnosis was a rotator cuff tear.
5  Q. Did he tell you that?
6  A. I don't recall whether he did or not.
7  Q. Did he give you any recommendations for
8  treatment?
9  A. No. I told him that Dr. Plattner was
10 not very optimistic about any kind of surgery or
11 any kind of medication or treatment.
12 Q. Did he criticize Dr. Ahmad to you?
13 A. I don't recall.
14 Q. Okay. Since your release, so I can
15 summarize, you saw Dr. Marsh one time for an exam,
16 you saw Dr. Plattner two times for exam and
17 treatment, and you were examined once by Dr.
18 Erhardt in his home, correct?
19 A. And I may have been examined, or Dr.
20 Cook may have examined my arm prior to the time he
21 wrote the letter, I'm not sure whether we just
22 talked about it or whether he actually looked at
23 my arm.
24 Q. So, that would sum up the totality of

Page 126

1  your medical treatment since your release from
2  jail in March of 2000, correct?
3  A. Medical treatment?
4  Q. Yeah, medical care, treatment, including
5  examination.
6  A. Since I left the jail?
7  Q. Yes.
8  A. The hernia operation was part of the --
9  Q. I meant for the right shoulder?
10 A. Okay, for the right shoulder, correct, I
11 think that's true.
12 Q. Now, after you were released from jail
13 in March 2000 until you saw Dr. Marsh, what did
14 you do with your time? Were you working? I don't
15 know what you were doing, so I don't know what
16 kind of activities you were engaging in.
17 A. I was engaged in veterinary work such as
18 it was.
19 Q. Did that involve you using both your
20 left and right arm?
21 A. Only when I was involved with something
22 smaller than about eight or nine or ten pounds.
23 If I could lift it with my left hand, I was fine.
24 Q. And if it was --

Page 127

1  A. If it was bigger, I had to have help to
2  do any heavy lifting.
3  Q. Did you use your right arm at all?
4  A. Well, for anything that wasn't going to
5  require lifting, yeah.
6  Q. Okay. Did you have any other incidents
7  where you fell or caused any injury to your right
8  arm or shoulder?
9  A. No.
10 Q. Did you participate in any other kind of
11 activities other than doing vet type activities?
12 A. You mean like tennis, basketball?
13 Q. I don't know; anything.
14 A. No.
15 Q. During this period of time who did you
16 see on a regular basis? Did you have somebody
17 helping you at your job? Did you have an
18 employee? Did you have an assistant?
19 A. No.
20 Q. Which persons did you see in your life
21 during that period of time?
22 A. Nobody.
23 Q. You didn't see anyone?
24 A. I have nobody working for me, no

Page 128

1 assistants, no secretaries, no phone answering.
2    Q.  Is there a friend that you saw on a
3 regular basis?
4    A.  No.
5    Q.  Is there any name you can give me about
6 somebody who would have knowledge about your
7 condition during this period of time?
8    A.  I can't think of anybody.
9    Q.  Now, you think you were examined by a
10 flight surgeon in October of 2002, correct?
11   A.  It was either 2002 or October of 2001.
12 I go once every two years.
13   Q.  Did they clear you to fly?
14   A.  I passed the physical.
15   Q.  Okay.  And did you get a copy of it?
16   A.  Yes.
17   Q.  Do you have a copy of it at home?
18   A.  Yes.
19   Q.  Okay.  I'm going to ask you, you don't
20 have a lawyer that I can ask, so I'm going to ask
21 you since you are a party, can you produce, by
22 sending me a copy of that?
23   A.  I don't think there's anything on there
24 about my shoulder because--

Page 129

1    Q.  Whatever it says I would like to have a
2 copy of it, okay?
3    A.  Sure.
4    Q.  Okay.  When I get it I will circulate it
5 with the other attorneys.  Do you have any other
6 documents from like Dr. Erhardt or Dr. Cook at
7 home?
8    A.  I have Dr. Cook's letter.
9    Q.  Okay.
10   A.  I don't have anything from Dr. Erhardt.
11   Q.  Okay.  Other than the one flight exam
12 which will tell us the date, and you have a copy
13 of, do you have any other documents relating to
14 your physical condition, including anything
15 relating to your right shoulder at home or no?
16   A.  No.
17   Q.  Okay.  In terms of your current
18 condition now, can you describe for me the pain
19 you notice with your right shoulder?
20   A.  Well, if I ride my bike, I exercise on
21 my bike on a daily basis, if I ride my bike more
22 than half a mile with my right arm or my hands on
23 the handlebar, my left hand on the handlbebar
24 also, after about a half a mile I have to take my

Page 130

1 right hand off because my shoulder is bothering
2 me, so I just let it hang at my side when I ride.
3 That's about the most prominent thing during the
4 day.
5    Q.  Does your right arm, is the pain
6 localized in the right shoulder?
7    A.  It's heat, and heat, the generation of
8 heat causes-- it's heat in my shoulder.  That's
9 where the pain comes from.
10   Q.  The generation of heat?
11   A.  The movement, long periods of time with
12 my arm in a certain position generates heat, and
13 that's when I get the pain.
14   Q.  Do you have pain every day in your right
15 shoulder?
16   A.  If I'm careful, no.
17   Q.  How often do you notice pain in your
18 right shoulder on a weekly basis?
19   A.  Several times a week, depending on what
20 my activity is.
21   Q.  What brings on the pain?
22   A.  Whatever my activity happens to be.
23   Q.  What type of activity brings it on?
24   A.  Activity where I have my arm in one

Page 131

1 position for any period of time at all.
2    Q.  Which position?
3    A.  Or if I try to lift something.  If I try
4 to lift the hood of my car, for instance, I will
5 have pain in my shoulder.  If I have to open up my
6 hatchback on my right arm I will have pain on my
7 shoulder.
8    Q.  How about, what position does your arm
9 have to be in for a long period of time for it to
10 cause pain?  Is it above your shoulder or --
11   A.  It could be any position, not
12 necessarily above, but straight out, 45 degree
13 angle to my body such as if you are riding a bike.
14   Q.  Okay.  What type of pain do you
15 experience?
16   A.  Just general pain.
17   Q.  I mean, is it a dull ache, is it a sharp
18 pain, is it excruciating pain?
19   A.  It's relative to the individual, so I'm
20 not sure what excruciating pain is.  But it's not
21 excruciating, but it's a discomfort.
22   Q.  Okay.  If you had to rate your pain at
23 one to ten, with ten being the worse pain you've
24 had with your right shoulder when you first

**Page 132**

1 injured it, I assume that was the worse, the day
2 it happened?
3   A. Correct.
4   Q. And what would you rate it at now, if
5 one was like the least amount of pain you could
6 describe, ten being the worse that you've already
7 experienced on the day of the accident? Where
8 would it be now on an average?
9   A. I would say on an average probably a
10 three.
11   Q. Okay. Does your pain cause you any
12 restriction in the use of your right shoulder?
13   A. Yes.
14   Q. And describe that for me.
15   A. Describe the restriction of use?
16   Q. Yes.
17   A. I have to be careful what I pick up.
18   Q. Okay. So, in terms of picking up--
19   A. Like the hood of my car or my hatchback,
20 for instance, or an animal over 15, ten or 15
21 pounds.
22   Q. What is the most you can lift with your
23 right hand?
24   A. I don't know.

**Page 133**

1   Q. Or arm?
2   A. I've never experimented with weights and
3 what I could lift and what I couldn't lift before
4 I had a problem.
5   Q. Before did you have any restrictions?
6 Before you were injured on December 12th, did you
7 have any restrictions?
8   A. None, no.
9   Q. Other than being unable to lift, what
10 other restrictions does your right arm cause you?
11   A. Well, let's see, I can't play golf, I
12 can't play tennis, I can't play racquetball, I
13 can't play football, I can't play baseball, so
14 anything that requires arm movement I can't do it.
15   Q. Did you do those things before on a
16 regular basis?
17   A. On a regular basis, no, but I've done
18 them before. I haven't done them since.
19   Q. Well, before you were incarcerated, I
20 mean what kind of activities did you do on a
21 regular basis?
22   A. Football, baseball, tennis, golfing.
23   Q. When you say regular basis, how often?
24   A. Several times a month. Basketball. I

**Page 134**

1 had a basketball hoop right there at the building.
2   Q. Have you tried to play basketball since?
3   A. Have I tried to play? I know I can't do
4 anything with my arm the way it is.
5   Q. So that means you haven't tried,
6 correct?
7   A. No, I haven't tried.
8   Q. Okay. Are there any other activities
9 other than the sporting type activities that you
10 believe you can't do because of your right
11 shoulder?
12   A. I'm restricted in what I can do in my
13 business.
14   Q. In what fashion?
15   A. In lifting.
16   Q. But you can still do your business,
17 correct?
18   A. Yes.
19   Q. Well, has the inability to lift
20 prevented you from doing your job?
21   A. Doing my job properly might be a
22 phraseology I would use.
23   Q. And in what fashion?
24   A. Well, if I'm going to examine an animal

**Page 135**

1 I have to get down on my knees and examine it now,
2 where before I could put it on a table and examine
3 it.
4   Q. Do you still have an active veterinary
5 practice?
6   A. Such as it is.
7   Q. What does that mean, such as it is?
8   A. That means it's not as good as it was in
9 the past, and it may not ever be like it was
10 before I went to being incarcerated.
11   Q. You don't attribute the decrease in your
12 business to your right shoulder problem, do you?
13   A. Well, I don't go around telling people I
14 have a right shoulder problem.
15   Q. So your decrease in business is due to
16 other factors other than your right shoulder,
17 correct?
18   A. It's probably due more to economy than
19 anything.
20   Q. Well, I'm saying you aren't saying that
21 you have earned less money as a veterinarian or
22 have less clients because of your right shoulder,
23 am I correct?
24   A. That's right.

Page 136

1   Q. Anything else other than the inability
2   to lift, which I've heard now back in your vet
3   practice and incidental things like lifting the
4   hood of a car or lifting something heavier than a
5   pot of coffee, or the recreational activities that
6   you say you can't do? Anything else you just flat
7   out can't do?
8   A. I can't carry groceries with my right
9   arm.
10  Q. Anything else?
11  A. Anything that involves my right arm in
12  daily living, I can't do it or I have trouble
13  doing it.
14  Q. Can you tell me any other type of
15  activities that you don't do because of the
16  problems you had with your right shoulder?
17  A. I don't ever put my handkerchief in my
18  right rear pocekt at the time any more.
19  Q. Okay. What else?
20  A. That's all I can think of right now.
21  Q. Are there any activities that you think
22  you do differently because of the problem with
23  your right shoulder, but you are able to do them,
24  but you just don't do the same way used to do

Page 137

1   them?
2   A. Yep, when I put my car away at night I
3   lift the garage door with my left hand instead of
4   my right.
5   Q. Anything else?
6   A. When I check the oil I lift my hood up
7   with my left hand instead of my right.
8   Q. Anything else?
9   A. If I roll the window up or down I use my
10  left hand instead of my right.
11  Q. Anything else?
12  A. Any number of things in daily living,
13  that it affects your whole life 24 hours a day.
14  Q. But you only have pain a couple times a
15  week, correct?
16  A. If I'm careful about how I use my arm,
17  yes.
18  Q. When was the last time before today that
19  your right arm or right shoulder hurt?
20  A. I took an aspirin two or three days ago,
21  I usually do twice a week, I take an aspirin to
22  keep the inflammation under control.
23  Q. So you take aspirin two or three times
24  per week to keep inflammation down?

Page 138

1   A. Uh-huh, yes.
2   Q. Do you take any other kind of medication
3   for your right shoulder pain?
4   A. Nope.
5   Q. You don't take any prescription
6   medication?
7   A. None.
8   Q. Have you ever taken any prescription
9   medication from the time you injured your right
10  arm on December 12, 1999, until today?
11  A. No.
12  Q. The only type medication you've ever
13  taken has been over-the-counter medication,
14  correct?
15  A. As far as I can remember, yes.
16  Q. Okay. And now since your release from
17  the jail you have taken aspirin every two or three
18  days to keep the inflammation down?
19  A. Two or three times a week.
20  Q. Okay. Do you have any plans to return
21  to see any doctor for your right shoulder?
22  A. Not unless the surgery procedures are
23  more optimistic than they are right now.
24  Q. So as of present knowing what you know

Page 139

1   about the state of surgical options, you have no
2   plans to see a doctor for further care for your
3   right shoulder, am I correct?
4   A. No.
5   Q. Am I correct?
6   A. No.
7   Q. I'm not correct?
8   A. No.
9   Q. Why am I incorrect?
10  A. Because my plans are in abeyance until I
11  insure that a procedure is developed that is 80
12  percent effective.
13  Q. Okay. Maybe you didn't understand my
14  statement. I said unless you learn that
15  procedures are 80 percent effective, you have no
16  plans to seek any further medical care or
17  treatment for your right shoulder, am I correct?
18  A. I have plans to seek further medical
19  treatment for my shoulder if the opportunity
20  presents itself.
21  Q. Is the opportunity of surgeries are
22  going to be 80 percent effective?
23  A. Surgeries that are different from what
24  they have had in the past and what may be existing

Page 140

1 at the present time.
2  Q. So knowing what you know now and knowing
3 about what surgical options are out there for you
4 now, at present you have no intentions on going
5 back to a doctor unless things change, correct?
6  A. I do have intentions of going back.
7  Q. When are you going to go back to a
8 doctor, Mr. Wronke?
9  A. Whenever I find out that they have a
10 procedure that is worth risks.
11  Q. Okay. Until that time, you're not going
12 back?
13  A. My intentions are in pendency.
14  Q. Meaning you are going to live with it,
15 correct?
16  A. It means I'm, I call the shade tree
17 approach, I'm waiting until something develops
18 that is more reliable than what they have
19 currently.
20  Q. And what are you basing this knowledge
21 on that what's out there now is unreliable?
22  A. People I've talked to that have had
23 rotator cuff injuries repaired.
24  Q. Did you base that on what Dr. Plattner

Page 141

1 told you?
2  A. And what Dr. Plattner told me, yes. He
3 was not very optimistic.
4  Q. Is it your testimony that Dr. Plattner
5 recommended you have surgery?
6  A. No, he talked me out of surgery.
7  Q. Why?
8  A. He said that three things would happen.
9 Nothing, some improvement, no improvement, or
10 worse.
11  Q. Okay. Other than the visits with Dr.
12 Marsh that we talked about and Plattner, and the
13 MRI, are you claiming any other medical expenses
14 due to what you claim is negligence on the part of
15 Dr. Ahmad?
16  A. Well, it would be nice if the county
17 would pay me for my expenses to have my hernia
18 repaired.
19  Q. I'm talking about your right shoulder.
20 Are you claiming --
21  A. Not at the moment.
22  Q. Okay. So the medical expenses you are
23 claiming in this case relating to your right
24 shoulder would include the visit to Dr. Marsh, the

Page 142

1 two visits to Dr. Plattner, and I think he ordered
2 an MRI, would that be it?
3  A. I'm not sure.
4  Q. As far as you know?
5  A. I'd have to look and see. I don't want
6 to say something definitively because you will
7 hold me to it.
8  Q. Well, do you know of any other medical
9 expenses you are claiming as of the time of this
10 deposition?
11  A. I am not sure.
12  Q. Well, I'm going to ask that you produce
13 those if you have them other than what I have just
14 mentioned, the Dr. Marsh one visit, Dr. Plattner
15 two visits and the MRI?
16  A. Dr. Marsh charged me for a second visit.
17  Q. Well, if you got the bills, you are
18 going to be under a requirement, I'm going to ask
19 you to produce them. Because we have asked for
20 your medical bills in this case. So --
21  A. You have?
22  Q. Yeah?
23  A. From who?
24  Q. From the attorney, and that's of you,

Page 143

1 because you are the party.
2  A. Nobody asked me for any bills.
3  Q. Well, they were requested. I can assure
4 you of that. I'm not going to argue with you.
5  A. If you have the documentation give me a
6 copy and I will be glad to entertain it.
7  Q. I'm telling you there has been a request
8 for medical bills that you are claiming related to
9 this, as well as being in federal court you are
10 required to provide those to us, is my
11 understanding based on what we have done in this
12 case. So, if you have bills, please produce them.
13  A. Are you saying produce them right now?
14  Q. No, just produce them. When you are
15 going to go home you are going to look up this
16 flight surgeon thing, produce that.
17  A. I didn't say I would look up the flight
18 surgeon thing. I thought you were going to do
19 that.
20  Q. I have asked you to do it when you go
21 home.
22  A. Oh, yeah, my physical, yeah, I remember
23 that, yeah, sure, okay.
24  Q. If you have any medical bills that you

Page 144

1  are claiming are related to what you are claiming
2  in this case, can you please provide those?
3     A. I think Mr. Auler has got all this
4  stuff. He has got everything I had.
5     Q. All right. Other than the bills that
6  were provided by Mr. Auler, you are saying you
7  don't have any further bills, correct?
8     A. I don't know what Mr. Auler provided you
9  guys.
10    Q. All right. Well, I've asked you on the
11 record to produce any bills you have. If you
12 don't give them to me that's your choice. We have
13 already discussed your wage loss. You are not
14 claiming any wage loss in this case relative to
15 the county or Dr. Ahmad, am I correct?
16    A. No, I'm not looking for any wage loss.
17    Q. Okay. And Dr. Erhardt I take it didn't
18 charge you to see you in his house, did he, as far
19 as you know?
20    A. I don't know whether he did or not. We
21 may have exchanged some services. He may have
22 done the examination for me and in return I did
23 something for his horses. I can't recall.
24    Q. Okay. You didn't get any bill that you

Page 145

1  can put any finger on that you can give me an
2  amount?
3     A. I don't recall. I would have to look
4  at, I have a folder, I didn't bring it with me
5  this time. I had it with me last time.
6     Q. I don't have anything else.
7        MR. KLAUS: I got a couple. You go
8  ahead.
9              EXAMINATION BY
10             MR. REIFSTECK:
11    Q. Mr. Wronke, I want to focus a little bit
12 more on your job as a trustee at the county jail.
13 When were you first incarcerated at the county
14 jail?
15    A. October, I think it was the 5th of
16 October, 1955.
17    Q. I mean with respect to the incarceration
18 most recently where this accident allegedly took
19 place?
20    A. That was it, I was incarcerated on March
21 the 5, 1995.
22    Q. '95?
23    A. Did I say '55?
24    Q. I'm sorry.

Page 146

1     A. That would be a long time.
2     Q. Sometime in October of '95 roughly?
3     A. Right.
4     Q. And I believe that you spent some time
5  away from the actual Champaign County facility, is
6  that correct?
7     A. Yeah, I was only in Champaign County
8  about six or seven days and I was moved. I was
9  moved 19 times in 21 months.
10    Q. Okay.
11    A. Either back and forth to Coles County or
12 back and forth to DeWitt County or back and forth
13 to Ford County or wherever.
14    Q. When was the first time that you applied
15 for trustee status with the Champaign County
16 facilities?
17    A. I didn't apply for it. They knew I was
18 a trustee in Clinton, and when the sheriff found
19 out I was a trustee in Clinton why then he brought
20 me back when the new jail was going to open up
21 because they didn't have anybody to work in the
22 new jail.
23    Q. So were you a trustee only at the new
24 facility on Lierman?

Page 147

1     A. Right.
2     Q. Not at the downtown Urbana facility?
3     A. No.
4     Q. And somebody came to you from the
5  sheriff's department and --
6     A. Yeah, I think it was Officer Ogle I
7  think asked me if I wanted to be a trustee.
8     Q. And how did that take place? Did he
9  come by your cell one day and talk to you about
10 it, or give me an idea of what occurred?
11    A. I don't think they were all grumgling
12 about the clothes, the way they were handled and
13 how they did it, how come they weren't clean. So
14 he asked me if I would be interested in being a
15 trustee, a laundry trustee. I didn't know
16 anything about laundry trustee because I was
17 laundry trustee up in DeWitt County. So when I
18 came back, why he asked me if I wanted to be
19 laundry trustee at the new jail. I said it
20 doesn't make any difference to me. I didn't mind
21 it. It was something to do.
22    Q. Right. Did he describe the duties to
23 you as a laundry trustee?
24    A. No.

## Page 148

1  Q. Did he describe what you were supposed
2  to do as a laundry trustee?
3  A. No.
4  Q. Was that --
5  A. It was on-the-job training.
6  Q. So, after the initial conversation that
7  Mr. Ogle had with you, how long was it before you
8  started that laundry trustee?
9  A. As soon as I was moved over to the new
10 jail. I was in the old jail for a few days after
11 I came back from Clinton.
12 Q. So within a week?
13 A. They trickled people into the new jail a
14 little at a time, and I had been there about a
15 week or ten days.
16 Q. Okay. And so after the initial
17 conversation, then it took a week or ten days to
18 get transferred over to the facility on Lierman?
19 A. They were taking people every day, but
20 it was a slow process.
21 Q. Okay. But for you it was probably a
22 week to ten days to the best of your recollection?
23 A. Yeah.
24 Q. Is that yes?

## Page 149

1  A. Yes.
2  Q. And then when you get to the new
3  facility, first day you were there did you begin?
4  A. No, I think I was there a week or so.
5  They were having all kinds of problems with
6  inmates and changing clothes and new equipment and
7  stuff like that. So, it wasn't until about a week
8  or ten days after I was in the jail that they
9  wanted to know if I wanted to be the laundry
10 trustee.
11 Q. So about two or three weeks after the
12 initial conversation was when you actually began
13 as a laundry trustee?
14 A. Yeah, I think so.
15 Q. Approximately?
16 A. Yeah.
17 Q. Okay. And was it left up to you as to
18 whether you became a laundry trustee? That wasn't
19 something that you were compelled to do, was it?
20 A. No, but I think, I had to get approval
21 from somebody. I guess Nancy Griffith was the
22 trustee coordinator or whatever you call it,
23 trustee recruiter or something.
24 Q. But she was the person that in your mind

## Page 150

1  was in charge and made the final determination on
2  whether you could do that job?
3  A. I think yeah, she was.
4  Q. Okay. But, again, it was left up to
5  you, nobody said you are going to be laundry
6  trustee?
7  A. Right, she asked me if I wanted to be.
8  Q. Okay.
9  A. It was just, there was a radio in there
10 where we -- nobody had a radio anyway, so I
11 thought well, just for the use of the radio I
12 would be willing to be a laundry trustee, just to
13 hear current music and current news.
14 Q. Do you know about when that was that the
15 new facility opened?
16 A. It had to be right after the election in
17 '96. And I think, like I came back I'm pretty
18 sure it was the 4th of November of that year.
19 Q. Sometime at the end of 1996, early 1997?
20 A. Right.
21 Q. Okay. All right. What are the
22 facilities like where the laundry room is located?
23 Where I assume that you did your, performed your
24 duties in the laundry at the facility, is that

## Page 151

1  correct?
2  A. Right.
3  Q. And describe what the set up is there?
4  A. The laundry is right down the hall from
5  the aid station, and it's right next door to the
6  kitchen. And it's right next door to the control,
7  where they do all the door locking, door
8  unlocking.
9  Q. How big of an area is the laundry?
10 A. It had three washers and three dryers
11 and a sink. So, it wasn't real big. It was a
12 store room attached for clothes, for new clothes.
13 Q. Were the machines up against the wall
14 where there was open space in the middle, or were
15 the machines in the middle?
16 A. They were free standing, away from the
17 wall where you could walk around the machine.
18 Q. But you could get between the machine
19 and the wall if you wanted to?
20 A. Yes, and in between machines too.
21 Q. Okay. And basically what were your
22 duties as laundry trustee? Did you have to
23 pick up the laundry from somewhere, the dirty
24 laundry from somewhere, or was it brought to you?

Page 152

1  A. The dirty laundry was put into what they
2 call laundry bins, either the barrel type bin with
3 the casters or a rectangular canvas barrel. It
4 was plastic. The new ones were plastic. The old
5 ones were canvas, but the new ones were plastic.
6 They were rectangular.
7  Q. Was the clothes placed in the bins or
8 did you go around with the cart and solicit it
9 door to door?
10  A. The inmates would get clean clothes for
11 everything they turned in. They put the stuff in
12 the laundry bins, and they would get clean clothes
13 for return for whatever they put in.
14  Q. Where were the bins located? Where did
15 you pick them up from to take them to be cleaned?
16  A. They were usually in the laundry.
17  Q. Okay. And it was one of these bins that
18 you testified that eventually broke? Was that one
19 of the bins you were talking about?
20  A. Those were done in booking. That is the
21 only place that had the round ones is booking.
22  Q. But this is one of these laundry bins
23 that you would collect laundry in?
24  A. Just push it around. The rectangular

Page 153

1 ones were on four casters also but they were
2 attached, and they weren't detachable like they
3 were with the barrels.
4  Q. Okay. So, the barrels were designed to
5 be detachable? The casters on it?
6  A. Yeah, so that if you tip the barrel up
7 to empty it you wouldn't be picking up a 30 pound
8 set of casters with weights because the casters
9 were loaded with lead weights to keep the barrel
10 from tipping over.
11  Q. Okay. I think you testified that you
12 began your day as a laundry trustee at about 3:00
13 or 3:15 in the morning, is that correct?
14  A. Yeah.
15  Q. And I think your testimony was that an
16 officer or one of the corrections officer came
17 down to wake you up, is that correct?
18  A. Yeah, every night when I came back from
19 laundry duty I would put a sign on the panel where
20 the officer was sitting to wake up inmate X, Y, Z
21 in cell number X, Y, Z at 3:00 to 3:15.
22  Q. So this is a request that you kind of
23 put in on a card of some type?
24  A. Just write it on a piece of paper

Page 154

1 because I didn't know who was going to be on duty
2 from midnight to seven or midnight to eight or
3 eleven to seven.
4  Q. Where did you submit this card?
5  A. Just as a little piece of paper, I tape
6 it right to the panel, the panel that unlocks and
7 locks the doors of the cells, as well as the pod
8 as well as the individual cells. I would tape the
9 sign right to the panel so the guard would see it,
10 and they did a walk around every 20 minutes. So
11 when he did his 3 o'clock walk around he would
12 just go ahead and kick my door open.
13  Q. And it was okay with the jail personnel
14 that you were up that early to go do your job?
15  A. It was either up that early or not get
16 the job done, one or the other.
17  Q. All right. What time did you actually
18 go down to start laundry? Did you get up in the
19 morning and go right to the laundry, or did you
20 get up and shower, eat breakfast, anything like
21 that?
22  A. There was no breakfast until after six
23 o'clock, so I would get up and brush my teeth and
24 shave. And then when I heard the door open on my

Page 155

1 cell I would go out and stand at the pod door,
2 then he would open the pod door, he would have to
3 open three or four doors between my cell and the
4 outside where I can go to the laundry.
5  Q. Did you ever say to anybody at the jail
6 hey, this is too early to get up and start doing
7 this stuff?
8  A. I don't know if I ever said that or not.
9  Q. Okay. Did it occur to you that it was
10 awful early in the morning to start a shift as a
11 laundry trustee?
12  A. I wasn't in any position to even be
13 asking those kind of questions.
14  Q. Okay.
15  A. Didn't make any difference to me what
16 time I started. I would rather be in the laundry
17 than be in the pod with the dregs of society.
18  Q. I see. So then would you be on laundry
19 shift until it was time for breakfast?
20  A. Until after lock down.
21  Q. What time was lock down?
22  A. 10:30 at night.
23  Q. I mean in the meantime, I think you said
24 at one point that you also served breakfast trays?

Page 156

1  A. I just took the breakfast trays to the
2  pods. A trustee had to take the breakfast trays
3  to the pods for the inmates.
4  Q. Okay. Was this concurrent with your
5  laundry duties?
6  A. Yeah.
7  Q. They didn't have separate kitchen
8  trustees to do that work?
9  A. They did, but for some reason they
10 weren't letting very many of them take, go to the
11 pods because that was a way that inmates in the
12 kitchen could slip inmates in the pods different
13 items of contraband.
14 Q. So, somebody, was it the same routine
15 with the laundry trustee position that somebody
16 asked you to serve breakfast trays?
17 A. I don't know how that ever got started.
18 I know they were shorthanded in the kitchen and
19 she couldn't let one of the -- she didn't have
20 the -- Lynn Dodds, the cook, didn't have the
21 authority to let those guys in the kitchen go back
22 to the pods with the breakfast stuff because when
23 they went back to the pods they had to be frisked
24 by the officers. So she wouldn't let any of her

Page 157

1  guys go because none of them were authorized to go
2  into the pods.
3  Q. Were you compelled at any point, did
4  someone order you to do this breakfast duty?
5  A. I don't know if they ordered me or not,
6  but the implication was if you don't do it you
7  might lose your job. That's how that was stated.
8  Q. And you wanted to keep your job because
9  you didn't want to spend time in the pod with the
10 dregs of society?
11 A. Yeah.
12 Q. Okay. And with respect to some
13 janitorial work, and I'm calling it janitorial,
14 you mentioned some mopping duties and things you
15 had, was that separate and apart or was that just
16 part of the laundry type duties?
17 A. There was always spillage in the
18 laundry, but I don't know, it was kind of an
19 unwritten thing that in front of your door, in
20 your area, right around your area, you had to keep
21 it clean. So I would do the hallway at least one
22 or twice a day.
23 Q. You mean in front of the laundry?
24 A. In front of the laundry, yeah.

Page 158

1  Q. So that was part of a job as a laundry
2  trustee, to keep everything clean?
3  A. You had to do your own cell too.
4  Q. Okay. So you did the mopping, you were
5  testifying to, with regard to your cell?
6  A. Yeah.
7  Q. Okay. Then after you're served the
8  breakfast trays I take it you went back to the
9  laundry area?
10 A. Right.
11 Q. And you continued to do your laundry
12 duties?
13 A. Went back and picked up the empty trays,
14 brought those back.
15 Q. Okay. What about lunch trays?
16 A. Same.
17 Q. Same drill with the breakfast?
18 A. Yeah.
19 Q. The inmates didn't eat in a common area?
20 They ate trays in their cells?
21 A. It depends. Some, if they are on
22 lockdown they ate in their cells, but if they are
23 not on lock down there is tables, I think six
24 stools to a table, that the inmates ate at when we

Page 159

1  were taking their meals out of their cells.
2  Q. So you took --
3  A. But the officer hands the meals out.
4  Nobody touches the meals on the cart unless it's
5  the officer.
6  Q. Okay. So, what did you do then? Just
7  run around a big, some type of cart with trays on
8  it?
9  A. It was a stainless steel cart with four
10 wheels and two or three areas for trays to be
11 stacked one on top of another. So, it was just a
12 matter of pulling it to the different maximum
13 security or minimum security or isolation.
14 Q. And then the officers would actually --
15 A. The officers actually handed them to the
16 inmates.
17 Q. Okay. And then after you would get done
18 with the lunch trays, back to the laundry?
19 A. Right.
20 Q. And was it the same drill with trays at
21 dinner time?
22 A. Yep.
23 Q. And in the meantime any other duties
24 besides keeping your area clean and doing laundry

Page 160

1 and those types of things?
2   A. I did the inventory for, I projected the
3 inventory that we needed, we have clothes and
4 uniforms, but the delivering of the trays and the
5 maintaining the laundry and taking clothes to the
6 inmates and bringing them dirty clothes back, that
7 was pretty much it.
8   Q. Okay. And then you mentioned, or you
9 testified that you went back to your cell after
10 lights out?
11   A. Usually by 11 o'clock I was done, 11:30
12 I was done.
13   Q. Were you doing laundry the entire time?
14   A. Right.
15   Q. Okay. And then after 11 o'clock back to
16 your cell and do the same thing the next day?
17   A. Yep.
18   Q. Okay. Was this an every day assignment
19 or --
20   A. Yes.
21   Q. Seven days a week?
22   A. Yep.
23   Q. Okay. Could you request days off from
24 your job?

Page 161

1   A. When I went to the dentist or the doctor
2 they just locked the laundry. The guards would
3 lock the laundry door and I went to Villa Grove to
4 the dentist, why it would stay locked until I got
5 back.
6   Q. Did they ever assign you any help?
7   A. From time to time I would get one or two
8 people, but it was people that I knew either from
9 Homer or from Ogden, and they wanted something to
10 do. So I would go to Nancy Griffin and ask her if
11 I could have an assistant for a couple days until
12 they had their case resolved, then they would be
13 gone.
14   Q. I see. Did they ever assign anybody to
15 you that you would have preferred not to work
16 with?
17   A. Yeah. Sergeant Carter used to bring
18 black guys in there to work, and he and I about
19 came to blows over it because I said at my age I
20 could walk circles around any black dude in the
21 jail. The black guys would rather come to the
22 laundry, crawl under the table and sleep on top of
23 the milk cartons and not do anything. I said
24 that's not going to fly.

Page 162

1   Q. So how were those situations rectified?
2   A. They pulled the black guys out of there.
3   Q. So you would be back on your own
4 assignment?
5   A. Yeah, right.
6   Q. Okay. So, I guess it's fair to say then
7 based on your testimony that you didn't have an
8 assistant who was ever kind of a steady, weeks at
9 a time type assistant?
10   A. Oh, no, because most guys were there
11 just a short period of time until they had their
12 trial and got sentenced and they were gone.
13   Q. Okay. Did you ever request to be
14 removed from trustee status?
15   A. No.
16   Q. Say, you know what, I don't want to do
17 this any more.
18   A. No.
19   Q. And in sometime prior to May of 1999,
20 you were on trustee status? And the reason I pick
21 out May of 1999 was your hernia condition?
22   A. Yeah.
23   Q. Was that about the time of that?
24   A. No, the hernia actually was getting

Page 163

1 worse from October 6th, 1995.
2   Q. Okay.
3   A. Right on down to the wire. In fact,
4 they, Nancy Griffith and Lu Wilson and somebody
5 else, I'm not sure who it was, brought a liability
6 release to me, and they said if I didn't sign this
7 liability release that I would lose my job.
8       (Whereupon, Deposition Exhibit No. 1 was
9 marked for identification.)
10   Q. Let me show you what we have marked
11 number one Wronke 11/7/03 you talked about a
12 release. Is that the document you are talking
13 about?
14   A. Uh-huh, that's it.
15   Q. And that's dated 5/6/99, is that
16 correct?
17   A. Yeah.
18   Q. Is that your signature above Kenneth
19 Wronke, inmate?
20   A. Yes, it is.
21   Q. Do you know whose handwriting it is in
22 the bottom right-hand corner where it indicates
23 that two and a quarter pounds equals the weight of
24 one change of clothes for an inmate?

Page 164

1  A. Uh-uh.
2  Q. Is that no?
3  A. This is no, I don't know who that is.
4  Q. Do you know if that was on that when you
5  signed that, or is that something that was later
6  added?
7  A. That was something added.
8  Q. So on the document that you signed, that
9  handwriting in the bottom right-hand corner wasn't
10 present?
11 A. There was nothing on the bottom.
12 Q. Okay. And this document indicates, I
13 think what you testified to, in the second
14 paragraph in the event that Kenneth Wronke refuses
15 to sign this waiver he will be removed from the
16 work assignment in the laundry, is that correct?
17 A. That's right.
18 Q. So it was your understanding as of May
19 6th, 1999, that if you refused to sign that
20 Exhibit No. 1, that you wouldn't be a trustee any
21 more, is that correct?
22 A. That's right.
23 Q. Did anybody ever promise you any type of
24 benefit in return for being a trustee?

Page 165

1  A. Well, the guards all thought I ought to
2  be getting paid the same thing as Jim Fitzgerald
3  was getting paid. He did the same thing I did, or
4  I did the same thing he did. I did it in the new
5  jail, he did it in the old jail. And he was
6  making ten or 12 dollars an hour, so the guards
7  all thought I should have been paid since I was
8  doing a civilian's work, actually it was
9  considered a civilian's job than it was an inmate
10 job.
11 Q. So Jim Fitzgerald was a civilian
12 employed by the county or something?
13 A. He was the laundry trustee or laundry
14 technician or laundry whatever, captain of the
15 laundry up at the other jail.
16 Q. But he wasn't an inmate?
17 A. No.
18 Q. He was somebody out in the street who
19 did that for a living?
20 A. He did that as his job, yeah.
21 Q. Did you get any pay for your job as a
22 trustee?
23 A. I got three meals a day.
24 Q. Well, you would have gotten those

Page 166

1  anyway, would you not?
2  A. Yeah, well, I also had the use of the
3  radio.
4  Q. Okay.
5  A. So I suppose there it had some perks.
6  Q. Okay. Did anybody ever threaten to take
7  any type of benefits away from you if you didn't
8  continue on as a trustee?
9  A. I don't know what the politics of the
10 jail were at that time. I'm not sure what they
11 could take away from me in jail. I don't know
12 what benefits you are talking about.
13 Q. I'm just asking if anybody --
14 A. I never went outside, I never had any
15 recreation, I never saw daylight. So, I'm not
16 sure what benefits there were.
17 Q. Okay. Well, and that's what I'm asking,
18 nobody ever said, you know what, Dr. Wronke, if
19 you don't continue as a trustee, no exercise out
20 in the exercise yard, because you didn't get to do
21 that anyway?
22 A. I didn't get any exercise anyway.
23 Q. Okay. Or there will be no more TV for
24 you?

Page 167

1  A. I didn't have any TV.
2  Q. Because you didn't have TV?
3  A. Yeah, right.
4  Q. So, if you would have refused to, or
5  decided not to continue as a trustee life at the
6  jail would have been pretty much the same except
7  you would have been back in the pod with I believe
8  you said the dregs of society?
9  A. Dregs of society. I actually liked my
10 job because it went smooth for the officers. The
11 officers put up with a lot of crap. And my job
12 made their job easier. And I think that had more
13 to do with it than anything.
14 Q. I don't have anything further. Thanks,
15 doctor.
16          EXAMINATION BY
17          MR. KLAUS:
18 Q. I got a couple questions. Dr. Wronke,
19 you previously testified that Dr. Ahmad stitched
20 up the laceration the morning you had your
21 accident, is that right?
22 A. That's correct.
23 Q. Okay. And then a couple weeks later I
24 guess he removed the stitches, is that also

Page 168

1 correct?
2   A. **Somebody said it was ten days, but we**
3 **don't have calendars in the jail so I can't tell**
4 **you whether it was ten days or whether it was 14**
5 **days, but it was somewhere in that area.**
6   Q. Okay. Somewhere in the area between ten
7 to 14 days Dr. Ahmad removed your stitches, is
8 that fair to say?
9   A. **That's correct.**
10   Q. Okay. Did you have any problems with
11 the stitched laceration from the time that he
12 stitched it to the time the stitches were removed?
13   A. **I hot packed it every day. I think that**
14 **accelerated healing. I was afraid of getting an**
15 **infection so I put hot compresses on it, as hot as**
16 **I could stand to put on my arm.**
17   Q. So, is your answer that you didn't have
18 any complications?
19   A. **I did not have any complications, no,**
20 **thanks to my care.**
21   Q. I have nothing further. What we were
22 referring to earlier and that I said to you
23 earlier is everybody who has their deposition
24 taken has the right to either waive signature,

Page 169

1 which means you stand on the transcript, or have
2 the right to reserve it, in which case Mrs.
3 Parkinson down there will send you the second
4 transcript with an errata sheet and signature
5 page. And you have the right to review it, you
6 will then have to have your signature notarized on
7 that, but then you send the errata and the
8 signature page back to Mrs. Parkinson. Does that
9 mean you wish to reserve your signature?
10       THE WITNESS: I'm going to reserve my
11 signature. In fact, I won't sign it at all if I
12 can't make the corrections that I think need to be
13 made. If you are saying that the corrections
14 don't mean anything, then there's no sense even
15 sending it.
16       MR. HAGLE: I want to withdraw. This is
17 federal court, I was telling you what Illinois
18 procedure is. I don't want to represent what you
19 can or can't do. You are representing yourself.
20 That will be your decision to make your own
21 decision as to what is appropriate in terms of
22 reviewing the deposition. I don't mean to tell
23 you that I don't think you can make changes.
24 That's up to you. You do whatever you think is

Page 170

1 appropriate. If we want to object to what you do,
2 that is up to us to object. Okay?
3       THE WITNESS: Sure.
4       MR. KLAUS: Right. In fact, that's
5 exactly what I was going to say. I'm not going to
6 give you any legal advice. You have the right to
7 reserve your signature. She will provide you with
8 an errata sheet and she will provide you with a
9 signature sheet. If you think there are changes
10 that you want to make on the errata sheet, you are
11 entitled to do that. So you reserve your
12 signature, correct?
13       THE WITNESS: Right.
14       MR. HAGLE: I want to join in on the
15 comments just made. I don't want to misrepresent
16 you or mislead you. You do whatever you think is
17 appropriate in terms of reviewing the deposition.
18 Then it will be up to us and the judge to decide
19 about what it means.
20       (Deposition adjourned.)

Page 171

1       IN THE UNITED STATES DISTRICT COURT
        FOR THE CENTRAL DISTRICT OF ILLINOIS
2              STATE OF ILLINOIS
3
  KEN WRONKE,
4
        Plaintiff,
5
  -vs-            No. 01 2308
6
  CHAMPAIGN COUNTY SHERIFF'S OFFICE,
7 et al.,
8       Defendants.
        This is to certify that I have read the
9 transcript of my deposition taken in the
  above-entitled cause, and that the foregoing
10 transcript taken on November 7th, 2003, accurately
   states the questions asked and the answers given
11 by me, with the exception of the corrections, if
   any, on the attached errata sheet(s).
12      _____
              KENNETH WRONKE
13 Subscribed and Sworn before
   me this _____ day of
14 _____, 2003.
                  _____
15 Notary Public