E-FILED
Wednesday, 03 November, 2004  11:37:21 AM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | |
|---|---|
| KEN WRONKE, ) | |
| Plaintiff, ) | |
| v. ) | |
| ) | |
| CHAMPAIGN COUNTY SHERIFF'S ) | Case No. 01-2308 |
| DEPARTMENT; DAVID MADIGAN, ) | |
| individually; DAVID SMALLEY, ) | |
| individually; LU WILSON; DR. MAHER ) | |
| K. AHMAD, ) | |
| Defendants. ) | |

## ORDER

In December 2001, Plaintiff, Ken Wronke, filed a Complaint (#1) against Defendants Champaign County Sheriff's Department, David Madigan, David Smalley, Lu Wilson, and Dr. Maher Ahmad. In January 2003, Plaintiff filed a Fourth Amended Complaint (#120), alleging that Madigan, Smalley, and Wilson violated his constitutional rights and alleging medical malpractice against Ahmad. Jurisdiction over this case is based on federal question.

In August 2004, Defendant Ahmad filed a Motion For Summary Judgment (#182). In September 2004, Plaintiff filed a Motion To Strike Defendant Ahmad's Motion for Summary Judgment (#187). In September 2004, Ahmad filed a Motion To Strike Plaintiff's Counter-Affidavit (#191), and in October 2004, Ahmad filed a Motion To Strike Portions of Plaintiff's Response to Defendant Ahmad's Motion To Strike and Motion To Strike Plaintiff's Rebuttal Argument to Defendant Ahmad's Memorandum of Law (#201). After reviewing the parties' pleadings and memoranda, the Court **DENIES** Plaintiff's Motion To Strike Defendant Ahmad's Motion for Summary Judgment **(#187)** and **GRANTS** Defendant Ahmad's Motion for Summary Judgment **(#182)**. The Court **DENIES as moot** Defendant Ahmad's Motion To Strike Plaintiff's Counter-Affidavit **(#191)** and Motion To Strike Portions of Plaintiff's Response to Defendant Ahmad's Motion To Strike and Motion To Strike Plaintiff's Rebuttal Argument to Defendant Ahmad's Memorandum of Law **(#201)**.

I.  Background

Plaintiff's claims arose as a result of injuries he sustained to his forearm and shoulder in December 1999 while he was incarcerated at the Champaign County Correctional Center (hereinafter "Correctional Center" or "jail").

At times relevant to this suit, Defendant Madigan was Sheriff of Champaign County, responsible for the day-to-day operation of the Champaign County Sheriff's Department and its deputies, and for the Correctional Center.  Defendant Smalley was a deputy sheriff who worked at the Correctional Center.  Defendant Wilson, an agent of the Champaign County Sheriff's Department, was a registered nurse with authority to administer first aid and to order emergency medical care for jail residents.  Defendant Ahmad was a doctor and an agent of the Champaign County Sheriff's Department.

The parties dispute some of the facts in this case.  In the following background, where the facts are disputed, the Court has accepted Plaintiff's version.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (When ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party.).

While Plaintiff was incarcerated at the Correctional Center, Officer Ogle asked Plaintiff if he wanted to be a trustee and Plaintiff agreed.  As trustee, Plaintiff ran the laundry at the satellite jail, beginning about 1996 (Pl. dep., p. 19.)  In that role, he handled the laundry for inmates and mopped the laundry area and the hallway in front of the laundry room.  (Pl. dep., pp. 19, 157-58.)  In addition to his duties as laundry trustee, Plaintiff brought breakfast, lunch, and dinner trays to the officers, who then distributed meals to the inmates.  (Pl. dep., pp. 154-59.)

Plaintiff was not required to be a laundry trustee and he never requested to be removed from that position.  (Pl. dep., pp. 149, 162.)  His day began around 3:00 to 3:15 a.m. and ended around 11:00 p.m.  (Pl. dep., pp. 153-54, 160.)  He testified that he did not care what time he started and he would "rather be in the laundry than in the pod with the dregs of society."

(Pl. dep., p. 155.) He didn't have a regular long-term assistant. Sometimes he would ask for assistance when someone he knew was incarcerated. (Pl. dep., p. 161.)

On December 12, 1999, at around 6:00 a.m., Plaintiff was transferring laundry to a barrel that was on four casters. The barrel was not secured to the caster platform and as Plaintiff moved the laundry, the casters and the barrel separated. Plaintiff lost his balance and fell, hitting his forearm on a garbage can and sustaining a cut on his forearm. Plaintiff's shoulder did not hit anything when he fell. (Pl. dep., p. 25.)

Plaintiff initially planned to use "butterfly Band-aids" on the cut, but Lynn Dobbs, a cook in the kitchen, called Defendant Smalley. (Pl. dep., p. 26.) Smalley and Plaintiff then went to either the aid station or the booking room. Smalley immediately contacted Defendant Wilson, the nurse on call. Wilson did not come in to evaluate Plaintiff; instead, she gave Smalley instructions over the phone regarding the laceration. (Pl. dep., p. 30.) She instructed Smalley to have Plaintiff lie on his back and hold his arm up to control the bleeding. Then Smalley taped gauze over the laceration and that stopped the bleeding. (Pl. dep., p. 31.) Smalley told Plaintiff that Wilson said the doctor would be there in about thirty minutes. (Pl. Dep., p. 39.) Around this time, Plaintiff asked Smalley why they were not going to the emergency department, and Smalley told him that his injury would be taken care of in the aid station at the jail. (Pl. dep., p. 57.)

Defendant Smalley then left Plaintiff in the day room, where he waited until Defendant Ahmad arrived at the jail around 9:45 or 10:00 a.m. Once Dr. Ahmad arrived, Plaintiff was taken to the aid station. Plaintiff asked for a tetanus shot and some antibiotics, and Dr. Ahmad told Plaintiff that there were no "injectables" at the aid station. (Pl. dep., p. 44.) Dr. Ahmad then applied a local anesthetic to Plaintiff's arm and stitched the cut. Plaintiff does not recall whether Dr. Ahmad used antibiotic cream on the sutures. At this time, Plaintiff also told Dr. Ahmad that his shoulder hurt. Dr. Ahmad told him it might be referred pain from his forearm. Dr. Ahmad

did not examine the shoulder. After Dr. Ahmad finished treating Plaintiff, Plaintiff returned to

3

his regular work activities.

The day after Plaintiff injured himself, Defendant Wilson came to the laundry to check on his condition. She asked Plaintiff how he was doing, and he replied that he was fine, under the circumstances. Wilson did not examine his arm or have any discussion with Plaintiff about pain pills. (Pl. dep., pp. 52-53.) About ten days after Plaintiff was injured, Dr. Ahmad removed the stitches. At that time, he told Dr. Ahmad there was something wrong with his arm because the muscles in the biceps area and his forearm were smaller than on the left side. (Pl. dep., p. 71.) He also told him that he was concerned about his rotator cuff. (Pl. dep., p. 73.) After this contact, Plaintiff had no other contact with Dr. Ahmad.

Plaintiff testified that he was in constant pain and could not use his arm and shoulder for ten days after he injured himself. After December 13, 1999, Plaintiff never spoke with Defendant Wilson about anything related to his arm or shoulder and never requested pain medication from Wilson. From the time Dr. Ahmad removed his stitches in December 1999 until Plaintiff was released from jail in March 2000, Plaintiff never sought medical treatment or attention from Defendant Ahmad at the jail for his shoulder or arm and never told Ahmad that he was in pain. Plaintiff knew how to request medical care and knew he could go to the aid station at the jail, but he never visited the aid station for his shoulder. (Pl. dep., pp. 80-81.) He also did not ask to see any doctors outside the jail. (Pl. dep., p. 77.)

After he was released from the Correctional Center in March 2000, Plaintiff continued to experience pain and lack of mobility with his arm and shoulder. He treated himself by taking over-the counter pain medicine daily. (Pl. dep., p. 85.) He first went to see a doctor about his arm in January 2001, about ten months after his release. At that time, Plaintiff told Dr. Marsh that he needed to see a specialist. Dr. Marsh referred him to Dr. Dethmers. Plaintiff never saw Dr. Dethmers. Next, Dr. Marsh referred him to Dr. Plattner. He saw Dr. Plattner for an examination and MRI around March 2001.

Count V of Plaintiff's fourth amended complaint alleges that Defendant Ahmad's conduct in treating Plaintiff constituted medical malpractice.

## II.  Standard

### A.  Motion To Strike

The Court may order stricken from any pleading material that is redundant, immaterial, impertinent, or scandalous.  FED. R. CIV. P. 12(f).

### B.  Motion for Summary Judgment

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986).  In ruling on a motion for summary judgment, a district court has only one task:  to decide, based upon the evidence of record, whether a genuine issue exists as to any material fact that requires a trial.  *See Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir. 1994).  A disputed fact is "material" if it might affect the outcome of the case under the governing law, and a dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Anderson,* 477 U.S. at 248.

When ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party.  *Anderson,* 477 U.S. at 255.  The Court is not required to draw every conceivable inference from the record in favor of the nonmoving party, only those inferences that are reasonable.  *See Chmiel v. J.C. Penney Life Ins. Co.,* 158 F.3d 966, 968 (7th Cir. 1998).  Because the purpose of summary judgment is to isolate and dispose of factually unsupported claims, a nonmoving party must respond to the motion with evidence setting forth specific facts showing that there is a genuine issue for trial.  *Michael v. St. Joseph County,* 259 F.3d 842, 845 (7th Cir. 2001), *cert. denied,* 535 U.S. 1112 (2002).  Thus, the nonmoving party must do more than raise a "metaphysical doubt" as to the material facts, and instead must present definite, competent evidence to rebut the motion.  *Id*.

### III.  Motion To Strike

Plaintiff's motion to strike states that Defendant erred by citing to depositions that were not part of the record.  He relies on an Illinois state court case, which states that a deposition used to support a motion for summary judgment must be either signed by the deponent or contain a waiver of the deponent's signature, and it must be certified, sealed, and filed with the court clerk.  *See Bezin v. Ginsburg*, 375 N.E.2d 468, 474 (1st Dist. Ill. 1978).

Because Plaintiff elected to file his case in federal court, federal rules of procedure apply.  Federal Rule of Civil Procedure 30 governs depositions upon oral examination.  The deposition testimony provided by Defendant Ahmad in support of his motion for summary judgment complies with Rule 30.  Accordingly, the Court denies Plaintiff's motion to strike.  The Court will treat Plaintiff's motion to strike as a response to the motion for summary judgment.

### IV.  Motion For Summary Judgment

Defendant argues that he is entitled to summary judgment because Plaintiff has failed to establish the required elements of a medical malpractice claim.  The Court agrees.

As an initial matter, the Court notes that Plaintiff has responded to Defendants' motion for summary judgment by making more allegations.  A *pro se* plaintiff need not comply with the specific procedural requirements for a summary judgment motion described in Rule 7.1(D) of the Local Rules for the Central District of Illinois (*see* CDIL-LR 7.1(D)(5)).  Nevertheless, he must respond to the motion with definite, competent evidence setting forth specific facts showing that there is a genuine issue for trial.  *Michael,* 259 F.3d at 845.  When statements are not supported by reference to competent evidence, they do not effectively challenge a defendant's statements of undisputed facts.  Instead, they are simply unsupported conclusory allegations.

Rule 56(e) of the Federal Rules of Civil Procedure requires that affidavits offered in opposition to summary judgment be made on personal knowledge, setting forth facts that would be admissible in evidence, and showing affirmatively that the affiant is competent to testify to

the matters stated therein. FED. R. CIV. P. 56(e). Although "personal knowledge" may include inferences and opinions, those inferences must be substantiated by specific facts. *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) (citing *Davis v. City of Chicago*, 841 F.2d 186, 189 (7th Cir. 1988)). "Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted." *Hadley v. County of Du Page*, 715 F.2d 1238, 1243 (7th Cir. 1983). The Court will not rely upon statements that are conclusory, but will, where applicable, rely upon the more reliable evidence in the record, including the depositions of the parties and other witnesses. *See Market v. Illinois Bell Tele. Co.*, No. 01 C 3841, 2003 WL 22697284, *5-6 (N.D. Ill. Nov. 13, 2003).

Illinois substantive law governs medical malpractice claims brought in federal court. *Sellers v. Baisier*, 792 F.2d 690, 692 (7th Cir. 1986). In a negligence medical malpractice action, the plaintiff bears the burden of establishing the applicable standard of care, that the defendant negligently deviated from the applicable standard of care, and that the deviation resulted in plaintiff's injury. *Purtill v. Hess*, 489 N.E.2d 867, 872 (Ill. 1986). Furthermore, unless the negligence is so grossly apparent or the treatment so common as to be within the everyday knowledge of a layperson, expert medical testimony is required to establish the standard of care and the defendant's deviation from that standard. *Purtill*, 489 N.E.2d at 872.

Here, Plaintiff has failed to present any expert testimony to support his claim. Plaintiff raises a number of arguments to support his contention that he does not need expert testimony. He first contends that the doctrine of *res ipsa loquitur* applies in this case. The Court disagrees.

Under Illinois law, "[r]es ipsa loquitur is applicable in medical malpractice cases where the conduct of the doctor is grossly remiss or so contrary to acceptable and customary medical practices and standards shown of record that results or injuries complained of would not have occurred but for negligence." *Campbell v. United States*, 904 F.2d 1188, 1194 (7th Cir. 1990), quoting *Gatlin v. Ruder*, 534 N.E.2d 177, 178 (3d Dist. Ill. 1989), *rev'd on other grounds, Gatlin v. Ruder*, 560 N.E.2d 586 (Ill. 1990). For example, expert testimony is not required to meet the

burden of proof in medical malpractice cases involving obvious careless acts from which a lay person could use his common knowledge to infer negligence, such as leaving a sponge or an instrument in a patient's body after surgery. *Bryant v. LaGrange Mem'l Hosp.*, 803 N.E.2d 76, 84 (1st Dist. Ill. 2003). This exception to the requirement for expert testimony is rarely applied and is strictly limited to its facts. *Id.*

When a plaintiff relies on the doctrine of *res ipsa loquitur*, the Court must determine whether the doctrine applies as a matter of law. *Gatlin,* 560 N.E.2d at 590; *see* 735 ILCS 5/2-1113 ("where the plaintiff relies upon the doctrine of res ipsa loquitur, the court shall determine whether that doctrine applies"). "In making that determination, the court shall rely upon either the common knowledge of laymen, if it determines that to be adequate, or upon expert medical testimony, that the medical result complained of would not have ordinarily occurred in the absence of negligence on the part of the defendant. Proof of an unusual, unexpected or untoward medical result which ordinarily does not occur in the absence of negligence will suffice in the application of the doctrine." 735 ILCS 5/2-1113. In this case, unlike a case involving a doctor leaving a sponge in a patient's body after surgery, the facts do not support application of the doctrine of *res ipsa loquitur*.

Plaintiff next contends that he may prove proximate cause in a medical malpractice case using any affirmative evidence. In support, he relies on *Casey v. Penn*, 362 N.E.2d 1373 (2d Dist. Ill. 1977), a malpractice action based on the doctrine of informed consent. In that case, the Illinois appellate court stated that the plaintiff may prove "by affirmative evidence, not necessarily expert opinion testimony, that defendant's negligent treatment was a proximate cause of plaintiff's injury." *Casey*, 362 N.E.2d at 1375. However, a malpractice claim based on a physician's failure to inform a patient is distinct from a claim where the assessment of negligence requires specialized skill and knowledge. "[T]he issue of proximate causation in an informed consent case relates to what a person of ordinary prudence would do under the same or similar circumstances as those confronting the plaintiff," therefore, the plaintiff may testify regarding proximate cause and expert testimony is not required. *See Coryell v. Smith*, 653 N.E.2d 1317, 1321-22 (1st Dist. 1995). In contrast, "[e]xpert evidence is required to support a

charge of malpractice when the assessment of the alleged negligence require[s] knowledge, skill, or training in a technical area outside the comprehension of lay persons." *Coryell*, 653 N.E.2d at 1320. In the instant case, the assessment of Dr. Ahmad's alleged negligence clearly requires specialized knowledge and training.

In addition to *Casey*, Plaintiff cites other cases, including *Turner v. Chicago*, 238 N.E.2d 100 (1st Dist. Ill. 1968), *Hyatt v. Cox*, 206 N.E.2d 260 (4th Dist. Ill. 1965), and *Palmer v. De Filippis*, 53 N.E.2d 34 (1st Dist. Ill. 1944). Those cases are inapposite because they are all personal injury cases, not medical malpractice cases. Illinois law is settled that a plaintiff alleging medical malpractice is required to present <u>expert</u> testimony to establish the standard of care and the defendant physician's deviation from that standard. *Purtill*, 489 N.E.2d at 872; *Coryell,* 653 N.E.2d at 1320.

The Court also notes that Plaintiff himself does not qualify as a competent expert who can testify as to the elements required to show medical malpractice. In *Sullivan v. Edward Hospital*, the Illinois Supreme Court reaffirmed the two "foundational requirements" that a health-care expert witness in a medical malpractice case must satisfy: The expert must be a licensed member of the school of medicine about which he proposes to testify, and he must be familiar with the methods, procedures, and treatments ordinarily observed by other health-care providers in either the defendant's community or a similar community. *Sullivan v. Edward Hosp.*, 806 N.E.2d 645, 655 (Ill. 2004). If the plaintiff fails to satisfy either of the foundational requirements, the trial court must disallow the expert's testimony. *Id.* Here, notwithstanding Plaintiff's background as a veterinarian, emergency medical technician, and emergency rescue technician, he does not pass the threshold requirements as an expert competent to testify regarding the applicable standard of care or Dr. Ahmad's conduct.

Finally, Plaintiff's proposed "expert" may not testify as an opinion witness in order to raise a dispute regarding Defendant's expert medical opinion. In its February 2004 Order, the Court informed Plaintiff that failure to make a proper disclosure would preclude Plaintiff from

calling these witnesses at trial. (#165, p. 2.) Plaintiff may not circumvent the Rules of Civil Procedure regarding disclosure of expert witnesses by presenting these witnesses as "lay" or "opinion" witnesses.

When a plaintiff fails to provide an expert medical opinion, the facts presented by the defendant's expert opinion are undisputed. *Conrad v. Christ Cmty. Hosp.*, 395 N.E.2d 1158, 1161 (1st Dist. Ill. 1979) (affirming order of summary judgment because the plaintiff raised no genuine issues of material fact where the plaintiff failed to provide expert medical opinion). Here, Defendant's expert testified as to the proper standard of care and that Defendant Ahmad's treatment of Plaintiff met the applicable standard of care. When a plaintiff fails to provide an expert medical opinion to challenge Defendant's expert testimony, the Court may properly grant summary judgement in favor of the defendant. *See Stevenson v. Nauton,* 390 N.E.2d 53, 57 (1st Dist. Ill. 1979) ("Where the plaintiff has failed to indicate that she has an expert medical opinion to sustain allegations or would be able to obtain such opinion in the future and was given numerous opportunities to secure such testimony summary judgment in favor of the defendant is proper.").

An examination of the record shows that Plaintiff has had sufficient time and opportunity to obtain an expert medical opinion to sustain his allegations. Over four years have elapsed since the time the alleged negligent acts were committed and the time Defendant Ahmad filed his motion for summary judgment. When Plaintiff finally came up with an expert, he did not provide an opinion to sustain the allegations. In February 2004, the Court struck Plaintiff's first expert report for failure to comply with Federal Rule of Civil Procedure 26 and allowed Plaintiff time to file a proper disclosure. (Order, #165.) Plaintiff subsequently filed an "Amended Submission of Expert Report" (#167). The Court struck this document also for failing to comply with Rule 26. (Order, #175.) Summary judgment is appropriate where a plaintiff has failed to secure expert medical testimony in a medical malpractice case in spite of adequate opportunity to do so. *See Stevenson*, 390 N.E.2d at 57 (granting summary judgment in favor of the defendant when plaintiff had several opportunities to secure expert medical testimony and failed to do so).

Accordingly, the Court grants summary judgment in favor of Defendant Ahmad on Count V.

### V.  Summary

For the reasons set forth above, the Court **DENIES** Plaintiff's Motion To Strike Defendant Ahmad's Motion for Summary Judgment **(#187)** and **GRANTS** Defendant Ahmad's Motion for Summary Judgment **(#182)**.  In addition, the Court **DENIES as moot** Defendant Ahmad's Motion To Strike Plaintiff's Counter-Affidavit **(#191)** and Motion To Strike Portions of Plaintiff's Response to Defendant Ahmad's Motion To Strike and Motion To Strike Plaintiff's Rebuttal Argument to Defendant Ahmad's Memorandum of Law **(#201)**.  The clerk is directed to enter judgment in favor of Defendant Ahmad and against Plaintiff on Count V.

ENTER this 2nd day of November, 2004.



                                                s/ DAVID G. BERNTHAL
                                                U.S. MAGISTRATE JUDGE

H:\Inbox\ORDER\2004\wronke v champ co.01-2308.MSJ#182.wpd