E-FILED
Thursday, 18 November, 2004  08:24:12 AM
Clerk, U.S. District Court, ILCD

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION**

| | |
|---|---|
| **KEN WRONKE,**           ) | |
|               **Plaintiff,**   ) | |
|    v.           ) | |
|           ) | |
| **CHAMPAIGN COUNTY SHERIFF'S**   ) | Case No. 01-2308 |
| **DEPARTMENT; DAVID MADIGAN,**   ) | |
| individually; **DAVID SMALLEY,**   ) | |
| individually; **LU WILSON; DR. MAHER**   ) | |
| **K. AHMAD,**           ) | |
|              **Defendants.**   ) | |

# ORDER

In December 2001, Plaintiff, Ken Wronke, filed a Complaint (#1) against Defendants Champaign County Sheriff's Department, David Madigan, David Smalley, Lu Wilson, and Dr. Maher Ahmad. In January 2003, Plaintiff filed a Fourth Amended Complaint (#120), alleging that Madigan, Smalley, and Wilson violated his constitutional rights and alleging medical malpractice against Ahmad. Jurisdiction over this case is based on federal question.

In August 2004, Defendant Wilson filed a Motion for Summary Judgment (#180). In September 2004, Plaintiff filed a Motion To Strike Defendant Wilson's Motion for Summary Judgment (#188). After reviewing the parties' pleadings and memoranda, the Court **DENIES** Plaintiff's Motion To Strike Defendant Wilson's Motion for Summary Judgment **(#188)** and **GRANTS** Defendant Wilson's Motion for Summary Judgment **(#180)**.

## I.  Background

Plaintiff's claims arose as a result of injuries he sustained to his forearm and shoulder in December 1999 while he was incarcerated at the Champaign County Correctional Center (hereinafter "Correctional Center" or "jail").

At times relevant to this suit, Defendant Madigan was Sheriff of Champaign County, responsible for the Correctional Center and for the day-to-day operation of the Champaign County Sheriff's Department and its deputies. Defendant Smalley was a deputy sheriff who worked at the Correctional Center. Defendant Wilson, an agent of the Champaign County Sheriff's Department, was a registered nurse with authority to administer first aid and to order emergency medical care for jail residents. Defendant Ahmad was a doctor and an agent of the Champaign County Sheriff's Department.

The parties dispute some of the facts in this case. In the following background, where the facts are disputed, the Court has accepted Plaintiff's version. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986) (When ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party.).

Plaintiff was incarcerated at the Correctional Center from October 1995 to March 2000. In 1996, Officer Ogle asked Plaintiff if he wanted to be laundry trusty and Plaintiff agreed. As trusty, Plaintiff handled the laundry for inmates and mopped the laundry area and the hallway in front of the laundry room. (Pl. dep., pp. 19, 157-58.) In addition to his duties as laundry trusty, Plaintiff brought breakfast, lunch, and dinner trays to the officers, who then distributed meals to the inmates. (Pl. dep., pp. 154-59.)

Plaintiff was not required to be a laundry trusty and he never requested to be removed from that position. (Pl. dep., pp. 149, 162.) His day began around 3:00 to 3:15 a.m. and ended around 11:00 p.m. (Pl. dep., pp. 153-54, 160.) He testified that he did not care what time he started and he would "rather be in the laundry than in the pod with the dregs of society." (Pl. dep., p. 155.) He did not have a regular long-term assistant. Sometimes he would ask Nancy Griffin to assign him an assistant when someone he knew was incarcerated and she would do so. (Pl. dep., p. 161.)

On December 12, 1999, at around 6:00 a.m., Plaintiff was transferring laundry to a barrel

that was on four casters. The barrel was not secured to the caster platform and as Plaintiff moved the laundry, the casters and the barrel separated. Plaintiff lost his balance and fell, hitting his forearm on a garbage can and sustaining a cut on his forearm. Plaintiff's shoulder did not hit anything when he fell. (Pl. dep., p. 25.)

Plaintiff initially planned to use "butterfly Band-aids" on the cut, but Lynn Dobbs, a cook in the kitchen, called Defendant Smalley for first aid. (Pl. dep., p. 27.) Smalley and Plaintiff then went to either the first aid station or the booking room. Smalley immediately contacted Defendant Wilson, the nurse on call. Wilson did not come in to evaluate Plaintiff; instead, she gave Smalley instructions over the phone regarding the laceration. (Pl. dep., p. 30.) She instructed Smalley to have Plaintiff lie on his back and hold his arm up to control the bleeding. Then Smalley taped gauze over the laceration and that stopped the bleeding. (Pl. dep., p. 31.) Smalley told Plaintiff that Wilson said the doctor would be there in about thirty minutes. (Pl. dep., p. 39.) Around this time, Plaintiff asked Smalley why they were not going to the emergency department, and Smalley told him that his injury would be taken care of in the aid station at the jail. (Pl. dep., p. 57.)

Defendant Smalley then left Plaintiff in the day room, where he waited until Defendant Ahmad arrived at the jail around 9:45 or 10:00 a.m. Once Dr. Ahmad arrived, Plaintiff was taken to the aid station. Plaintiff asked for a tetanus shot and some antibiotics, and Dr. Ahmad told Plaintiff that there were no "injectables" at the aid station. (Pl. dep., p. 44.) Dr. Ahmad then applied a local anesthetic to Plaintiff's arm and stitched the cut. Plaintiff does not recall whether Dr. Ahmad used antibiotic cream on the sutures. At this time, Plaintiff also told Dr. Ahmad that his shoulder hurt. Dr. Ahmad told him it might be referred pain from his forearm. Dr. Ahmad did not examine the shoulder. After Dr. Ahmad finished treating Plaintiff, Plaintiff returned to his regular work activities.

The day after Plaintiff injured himself, Defendant Wilson came to the laundry to check on his condition. She asked Plaintiff how he was doing, and he replied that he was fine, under

the circumstances. Wilson did not examine his arm or shoulder or have any discussion with Plaintiff about pain pills. (Pl. dep., pp. 52-53.) About ten days after Plaintiff was injured, Dr. Ahmad removed the stitches. At that time, he told Dr. Ahmad there was something wrong with his arm because the muscles in the biceps area and his forearm were smaller on the right side than on the left side. (Pl. dep., p. 71.) He also told him that he was concerned about his rotator cuff. (Pl. dep., p. 73.) After this contact, Plaintiff had no other contact with Dr. Ahmad.

Plaintiff testified that he was in constant pain and could not use his arm and shoulder for ten days after he injured himself. After December 13, 1999, Plaintiff never spoke with Defendant Wilson about anything related to his arm or shoulder and never requested pain medication from Wilson. From the time Dr. Ahmad removed his stitches in December 1999 until Plaintiff was released from jail in March 2000, Plaintiff never sought medical treatment or attention from Defendant Ahmad at the jail for his shoulder or arm and never told Ahmad that he was in pain. Plaintiff knew how to request medical care and knew he could go to the aid station at the jail, but he never visited the aid station for his shoulder. (Pl. dep., pp. 80-81.) He never asked to see any doctors outside the jail. (Pl. dep., p. 77.)

Plaintiff testified that he told Joyce Ahrens, another nurse at the jail, about his shoulder pain. However, he stated that his contact with her was incidental and not in her official capacity as nurse. (Pl. dep., p. 107.) He obtained over-the-counter pain medication (aspirin, Tylenol, or ibuprofen) from Ms. Ahrens every few days. He also obtained pain medication from the guards two or three times a week by telling them that he had a headache. (Pl. dep., pp. 66-67.) He did not tell them the medication was for his shoulder or arm.

After he was released from the Correctional Center in March 2000, Plaintiff continued to experience pain and lack of mobility with his arm and shoulder. He treated himself by taking over-the counter pain medicine daily. (Pl. dep., p. 85.) He first went to see a doctor about his arm in January 2001, about ten months after his release. At that time, Plaintiff told Dr. Marsh that he needed to see a specialist. Dr. Marsh referred him to Dr. Dethmers. Plaintiff never saw Dr. Dethmers. Next, Dr. Marsh referred him to Dr. Plattner. He saw Dr. Plattner for an

4

examination and MRI around March 2001.

Plaintiff's fourth amended complaint alleges one claim against Defendant Wilson in her individual capacity. Count IV alleges that she violated Plaintiff's constitutional rights under the Eighth Amendment by willfully refusing to provide medical attention.

## II. Standard
### A. Motion To Strike

The Court may order stricken from the pleadings any material that is redundant, immaterial, impertinent, or scandalous. FED. R. CIV. P. 12(f).

### B. Motion for Summary Judgment

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986). In ruling on a motion for summary judgment, a district court has a single task: to decide, based upon the evidence of record, whether a genuine issue exists as to any material fact that requires a trial. *See Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir. 1994). A disputed fact is "material" if it might affect the outcome of the case under the governing law, and a dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson ,* 477 U.S. at 248.

When ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *Anderson,* 477 U.S. at 255. The Court is not required to draw every conceivable inference from the record in favor of the nonmoving party, but only those inferences that are reasonable. *See Chmiel v. J.C. Penney Life Ins. Co.,* 158 F.3d 966, 968 (7th Cir. 1998). Because the purpose of summary judgment is to isolate and dispose of factually unsupported claims, a nonmoving party must respond to the motion with evidence setting forth specific facts showing

that there is a genuine issue for trial. *Michael v. St. Joseph County,* 259 F.3d 842, 845 (7th Cir. 2001), *cert. denied,* 535 U.S. 1112 (2002). Thus, the nonmoving party must do more than raise a "metaphysical doubt" as to the material facts, and instead must present definite, competent evidence to rebut the motion. *Id*.

### III. Motion To Strike

Plaintiff's motion to strike states that Defendant erred by citing to depositions that were not part of the record. He relies on an Illinois state court case, which states that a deposition used to support a motion for summary judgment must be either signed by the deponent or contain a waiver of the deponent's signature, and it must be certified, sealed, and filed with the court clerk. *See Bezin v. Ginsburg*, 375 N.E.2d 468, 474 (1st Dist. Ill. 1978).

Because Plaintiff elected to file his case in federal court, federal rules of procedure apply. Federal Rule of Civil Procedure 30 governs depositions upon oral examination. The deposition testimony provided by Defendant Wilson in support of her motion for summary judgment complies with Rule 30. Accordingly, the Court denies Plaintiff's motion to strike. The Court will treat Plaintiff's motion as a response to the motion for summary judgment.

### IV. Motion For Summary Judgment

Defendant Wilson argues that she is entitled to summary judgment because Plaintiff has failed to establish (1) that Plaintiff's injuries constituted a serious medical condition, or (2) that Defendant acted with deliberate indifference.

### A. Evidentiary Issues

As an initial matter, the Court notes that Plaintiff has responded to Defendant's motion for summary judgment by making more allegations. A *pro se* plaintiff need not comply with the specific procedural requirements described in Rule 7.1(D) of the Local Rules for the Central District of Illinois (*see* CDIL-LR 7.1(D)(5)). Nevertheless, he must respond to the motion with evidence setting forth specific facts showing that there is a genuine issue for trial. *Michael,* 259 F.3d at 845. When statements are not supported by reference to competent evidence, they do not effectively challenge a defendant's statements of undisputed facts. Instead, they are simply unsupported conclusory allegations.

Rule 56(e) of the Federal Rules of Civil Procedure requires that affidavits offered in opposition to summary judgment be made on personal knowledge, setting forth facts that would be admissible in evidence, and showing affirmatively that the affiant is competent to testify to the matters stated therein. FED. R. CIV. P. 56(e). Although "personal knowledge" may include inferences and opinions, those inferences must be substantiated by specific facts. *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) (citing *Davis v. City of Chicago*, 841 F.2d 186, 189 (7th Cir. 1988)).

Many of the assertions in Plaintiff's affidavit do not constitute the "definite, competent evidence" required to rebut Defendants' facts. *See Michael*, 250 F.3d at 845. For example, in Paragraph 9 of Plaintiff's counter-affidavit, he stated, "I became 'Shocky' immediately after striking the counter and then falling 3 feet and hitting a garbage can edge on the way to the floor." (#188, Pl. aff., ¶ 9.) In Paragraph 18, he stated, "Wilson states in her Affidavit that wounds can be closed with sutures up to six hours of opening. She neglects to mention that the statement is true only under the most favorable conditions in a surgical suite setting . . . and not 'meat-ball' surgery as one might see on M*A*S*H*." (#188, Pl. aff., ¶ 18.) In Paragraph 19, he stated, "Ahmad put the Plaintiff Wronke at extreme risk of infection as he was contaminated even before he began unauthorized surgery: he couldn't wash his hands without touching the contaminated faucets at the sink – there is 'no touch' plumbing at the jail medical department." (#188, Pl. aff., ¶ 19.) These statements and others in Plaintiff's affidavit are the type of

7

conclusory allegation that Rule 56 counsels should be disregarded on summary judgment. Furthermore, notwithstanding Plaintiff's background as a veterinarian, emergency medical technician, and emergency rescue technician, he does not satisfy the requirements to testify as an expert regarding medical care. *See Sullivan v. Edward Hosp.*, 806 N.E.2d 645, 655 (Ill. 2004). "Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted." *Hadley v. County of Du Page*, 715 F.2d 1238, 1243 (7th Cir. 1983). The Court will not rely upon statements that are conclusory, but will, where applicable, rely upon the more reliable evidence in the record, including the depositions of the parties and other witnesses. *See Market v. Illinois Bell Tele. Co.*, No. 01 C 3841, 2003 WL 22697284, *5-6 (N.D. Ill. Nov. 13, 2003).

### B.  The Eighth Amendment Violation

A prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement if she knows that an inmate faces a substantial risk of serious harm and she disregards that risk by failing to take reasonable measures to abate it. *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). In the medical care context, prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment when their conduct demonstrates "deliberate indifference to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To prevail, the detainee must show that (1) the official deprived the detainee of an objectively serious medical need; and (2) the official knew that the risk of injury was substantial but nevertheless failed to take reasonable measures to prevent it. *Chapman v. Keltner*, 241 F.3d 842, 845 (7th Cir. 2001). Under the first element, an objectively serious injury or medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention. *Id.; see also Davis v. Janes*, 936 F.2d 971, 972 (7th Cir. 1991) (a medical condition is deemed serious if it may be life-threatening or may pose a risk of needless pain or lingering disability if not treated at once). Under the second element, it must be shown "that the official was aware of the risk and consciously disregarded it." *Chapman*, 241 F.3d at 845.

Plaintiff suggests in his affidavit that the cut was medically serious because of the possibility of shock and excessive blood loss. However, he presents no evidence that he was in shock or that he lost a dangerous amount of blood. In fact, he stated in his deposition that the bleeding stopped when Sergeant Smalley applied gauze, which happened shortly after the injury.

Plaintiff also testified that he was originally going to bandage it with butterfly bandaids, but Lucy Dobbs called Sergeant Smalley. Following Defendant Wilson's directions, Smalley effectively stopped the bleeding until Dr. Ahmad could suture the cut. Plaintiff has presented no evidence that he continued to have problems with the cut once it healed. Looking at the facts in the light most favorable to Plaintiff, the laceration arguably constituted a serious medical condition in the context of the Eighth Amendment.

Regarding his shoulder, Plaintiff testified that his shoulder did not hit anything when he fell. However, he reported that it hurt when Sergeant Smalley was first treating the cut. He also told Dr. Ahmad that his shoulder hurt when Ahmad was suturing Plaintiff's forearm. At that time, Dr. Ahmad told him it might be referred pain from his forearm. The next day, when Wilson came to the laundry room to follow up on Plaintiff's injury and treatment, Plaintiff did not mention the shoulder or that he was having any problems or any pain. About ten days after the injury, when Dr. Ahmad was removing his stitches, Plaintiff again told him that something was wrong with his right arm because the muscles on his right arm were smaller than on the left side. However, Plaintiff admits that, after that point, he did not tell Dr. Ahmad or Defendant Wilson that he was continuing to have problems with his shoulder or that he was in pain. Plaintiff's failure to request medical attention during the next ten days or, in fact, the next three months while he was incarcerated, undermines his contention that the condition was "serious" in the context of the Eighth Amendment. Furthermore, Plaintiff continued to perform the laundry work between the time he was injured and the time he was released in March 2000. This fact also undermines Plaintiff's argument that any injury to his shoulder was "serious" in the constitutional context.

Regarding Plaintiff's shoulder, Dr. Ahmad's expert opinion report states as follows:

9

      6. Activities performed by Mr. Wronke after the claimed shoulder injury are not compatible with the injury claimed by Mr. Wronke to have occurred at the time of the laceration.

      7. If an acute rotator cuff tear had occurred at the time of the laceration, Mr. Wronke would have been in sufficient pain to require pain medications (which he refused) and his pain would have led him to request further evaluation by Dr. Ahmad (which he did not).

(#182, attachment from Dr. Gerald Suchomski.) Based on the evidence, including Plaintiff's ability to continue working following his injury, his failure to seek medical care for his shoulder while he was incarcerated, and his failure to seek medical care for his shoulder for nine to ten months after he was released, Plaintiff has failed to show that his shoulder injury was "serious" in the context of the Eighth Amendment. *See Chapman*, 241 F.3d at 845.

      The second element of an Eighth Amendment violation requires that a defendant must have acted deliberately or recklessly in failing to treat a medically serious condition, meaning that the defendant must have committed an act so dangerous that his knowledge of the risk can be inferred or that the defendant actually knew of an impending harm easily preventable. *Antonelli v. Sheahan*, 81 F.3d 1422, 1427 (7th Cir. 1995). Mere negligence or even gross negligence does not constitute deliberate indifference. *Wilson v. Seiter*, 501 U.S. 294, 305 (1991).

      Assuming that the cut on his forearm was objectively serious, Plaintiff has presented no facts showing that Defendant Wilson was deliberately indifferent. Although Wilson did not personally treat the cut, she provided Sergeant Smalley with information about how to treat the cut until Dr. Ahmad arrived. Wilson testified that she could not perform the suturing herself, but she called Dr. Ahmad and informed him about Plaintiff's injury and that it needed to be sutured. Dr. Ahmad sutured the laceration and Wilson followed up the next day with a visit to the laundry to check on Plaintiff. At that visit, she asked Plaintiff how he was doing, and he replied that he was fine, under the circumstances. Based on this evidence, Plaintiff has failed to show that Wilson was deliberately indifferent to Plaintiff's forearm injury.

      Regarding the purported shoulder injury, Defendant Wilson cannot be held liable for

failing to treat an injury that she knew nothing about. *Chapman*, 241 F.3d at 845 (Under the second element, a plaintiff must show "that the official was aware of the risk and consciously disregarded it"); s*ee Farmer*, 511 U.S. at 838 (An official's failure to alleviate a significant risk that he should have perceived but did not, cannot be considered the infliction of punishment in terms of the Eighth Amendment.). Although Plaintiff testified that he was in much pain for the next ten days, obtained pain medication from Joyce Ahrens, and continued to have problems with his shoulder up to the time he was released, Plaintiff admits that he never told Wilson about the pain and problems he was having and he never sought medical care from Wilson. Based on the undisputed facts, no jury could find that Defendant Wilson knew about and was deliberately indifferent to a serious medical condition regarding Plaintiff's shoulder. Accordingly, the Court grants Wilson's motion for summary judgment on Count IV.

### V. Summary

For the reasons set forth above, the Court **DENIES** Plaintiff's Motion To Strike Defendant Wilson's Motion for Summary Judgment (**#188**) and **GRANTS** Defendant Wilson's Motion for Summary Judgment (**#180**). The clerk is directed to enter judgment in favor of Defendant Wilson and against Plaintiff on Count IV.

ENTER this 17th day of November, 2004.



s/ DAVID G. BERNTHAL
U.S. MAGISTRATE JUDGE

H:\Inbox\ORDER\2004\wronke v champ co.01-2308.MSJ#180.order.wpd